TRUSTEES OF THE MUTUAL BUILDING FUND & DOLLAR SAVINGS BANK v. BOSSEIUX and others, Directors, etc.

(District Court, E. D. Virginia. August 17, 1880.)

1. SUIT BY ASSIGNEE IN BANKRUPTCY — TIME IN WHICH IT MAY BE BROUGHT.—It is not necessary that a cause of action should originally accrue or arise within two years before suit is brought by an assignee in bankruptcy.

*In re Eldridge & Co.* 2 Hughes, 256.

2. SAME—SAME.—Suit may be brought by the assignee at any time within two years after his appointment to office, provided the cause of action existed at the time of the filing of the petition in bankruptcy.

3. SAME—LIMITATIONS OF THE ASSIGNEE'S POWER OF SUIT—REV. ST. §§ 5046, 5047, 5103.—Section 5046 of the Revised Statutes provides: "All the property conveyed by the bankrupt in fraud of his creditors; all rights in equity, choses in actions, patent rights, and copyrights; all debts due him, or any person for his use, and all liens and securities therefor; and all rights of action which he had against any person arising from contract, or for the unlawful taking or detention or injury to the property of the bankrupt; and all his rights of redeeming such property or estate, together with the like right, title, power, and authority to sell, manage, dispose of, sue for, and recover or defend the same as the bankrupt might have had if no assignment had been made, shall, in virtue of the adjudication in bankruptcy, and the appointment of his assignee, but subject to the exceptions contained in the preceding section, be at once vested in such assignee." Section 5047 provides that such assignee shall have the like remedy to recover all the estate, debts, and effects in his own name as the debtor might have had if he had remained solvent. And section 5103 provides that trustees in bankruptcy shall have all the rights and powers of assignees in bankruptcy.

*Held,* that the assignee's power of suit is so far limited under section 5046 that (1) the thing sought to be recovered must be such as, when recovered, shall be assets of the estate; and (2) that the action brought must not be an action of tort for damages, such as at common law is strictly personal, and dies with the person.

4. SUIT BY TRUSTEES IN BANKRUPTCY—BANK DIRECTORS—NEGLIGENCE —REV. ST. § 5046.—*Held,* further, that a suit by the trustees in bankruptcy of a bankrupt bank against the directors of the corporation, to recover the losses incurred by the gross negligence of such directors, falls within the broad terms of said section 5046.

5. SAME—SAME—EQUITABLE RELIEF.—*Held,* further, that such suit may be brought in equity.

6. **BANK DIRECTORS—TRUSTEES.**—Directors of banks and other moneyed corporations hold the relation to stockholders, depositors, and creditors of trustees to *cestuis que trust*, and as such are personally responsible for frauds and losses resulting from gross negligence and inattention to the duties of their trust.

In Equity.   Demurrer to the Bill.

*Thomas G. Jackson* and *James Neeson*, for complainants.

*John A. Meredith, John B. Young,* and *C. C. McRae,* for defendants.

HUGHES, D. J.   The Mutual Building Fund & Dollar Savings Bank of Richmond suspended payments in September, 1873; made an assignment in liquidation in January, 1874; and was adjudicated a bankrupt by this court on the twenty-sixth of March, 1874.   The complainants were appointed in due course of proceedings as trustees, instead of assignees, in bankruptcy, and brought this bill within the period of two years, limited by law.

The bill is brought against 14 defendants, alleged to have been directors in the years 1872 and 1873.   It sets out a series of acts *ultra vires;* charges gross negligence and inattention; alleges great losses of capital and funds in consequence; and prays that the directors defendant may be required to make good the losses of the bank alleged to have been sustained from the negligence charged.

The case stands and is before me after argument upon the demurrer of the defendants, which, for the purposes of pleading, admits as true the allegations of the bill.   These allegations, which are, in the bill, drawn out in technical form and detail, are, in substance, as follows: The assets of the bank are almost worthless, while its indebtedness amounts to $135,000.   The directors kept no minutes of their proceedings during the years 1872 and 1873.   After the failure, to-wit, in October, 1873, the directors, by public newspaper card, invited new deposits, promising to hold them as a special fund to meet checks drawn against it; and in the same card promised to pay the bank's then existing indebtedness in *pro rata* instalments, as the bank should collect and realize from

loans and securities.  Yet, after this notice, the directors settled with some of the creditors in full, or in sums exceeding each creditor's *pro rata* share of assets,—either by transferring assets of the bank, or by sale of assets at ruinous discounts,—to the amount of $56,444, as shown by a list filed as an exhibit.  The bill charges that this preference was unlawful and unjust, and that the directors either made the transactions themselves, or, by reckless neglect, abandoned their trust and duty, and permitted the president and cashier of the bank to do so for them.

This cashier, Thomas S. Armstead, who held the office from January, 1868, to December, 1873, gave a bond to the directors, on receiving his appointment in 1868, in the penal sum of $15,000, with sureties; but John E. Bossieux, who was president at the time, knows nothing of the bond except that he placed it in the vault of the bank, and the said bond is lost, or else has been destroyed.  Complainants are, therefore, unable to ascertain whether the bond was conditioned for the faithful performance of his duty for the year 1868, or for the period of his service as cashier.  Complainants charge that if the bond did not cover the years 1872 and 1873, during which the losses of the bank from his misconduct occurred, then the directors are liable for not requiring a bond for those years.  Complainants have brought suit against said Armstead and his sureties to set up said bond, but fearing that it may be proved that the bond did not cover the years 1872 and 1873, they ask to be permitted to proceed against the defendants in this suit—to hold them responsible for their negligence in having failed to require of the cashier a proper official bond for those years.

The bill charges that the directors permitted John E. Bossieux to overdraw his account in 1872 and 1873 to the amount of $1,990; that the same has not been paid.  It charges that they permitted James Hunter, Jr., a depositor, to overdraw in 1872 and 1873 to the amount of $3,550 ; that this sum has never been paid, and that the directors had cause to believe that he was not responsible for the amount, and knew that he was also largely indebted to the bank at

the time, on negotiable notes, inadequately secured. It charges that the directors permitted A. A. Hutchinson, now a bankrupt, to overdraw in 1872 and 1873 to the amount of $15,000, although he was at the time also largely indebted to the bank on negotiable notes inadequately secured. It charges that the directors, in July, 1873, declared a dividend of 6 per cent. upon the face value of the capital stock of the bank, amounting to $5,921, that being dividend No. 12; and that this dividend was unlawfully paid out of the money of depositors and capital stock, and was paid to share-holders, whether their subscriptions to the capital stock had been fully paid or not. It charges that the directors declared and paid a dividend in January, 1873, known as dividend No. 11, amounting to $5,897, which was paid out of capital stock and deposits under like circumstances to those charged as to dividend No. 12. The same charge is repeated as to dividends No. 10 and 9, paid respectively in July, 1872, and in January, 1872—one of them amounting to $4,643, and the other to $5,636; all these dividends being of 6 per cent. on the nominal value of the capital stock.

The bill charges that the said four dividends were declared and paid, although the least investigation would have disclosed that the capital stock of the bank had already been exhausted by eight previous dividends which the bank had declared and paid—the first being of 10 per cent., and amounting to $907; the second, of 13½ per cent., amounting to $2,076; the third, of 10 per cent., amounting to $2,236; the fourth, of 10 per cent., amounting to $7,019; the fifth, of 5 per cent., amounting to $8,835; the sixth, of 8 per cent., amounting to $8,420; the seventh amounting to $7,634; and the eighth to $2,576. The bill charges that the directors, after all the profits and capital of the bank had been absorbed by "enormous dividends" declared up to 1872, and by loans upon worthless and inadequate securities, nevertheless did, in the years of 1872 and 1873, with the capital and the funds of depositors, buy up stock of the bank, as set out in a list exhibited, paying therefor $10,777. It charges that in 1872 and 1873 the directors declared and paid dividends to the

holders of stock who had paid little or nothing whatever of what was due upon it, as a list exhibited will show.

It charges that in the years 1872 and 1873 the directors entirely abandoned all their duties as such, except to hold semi-annual meetings, and left the entire management and control of the bank to Bossieux and Armstead, president and cashier, "who recklessly squandered" what then remained of its capital and funds, by "discounting and guarantying worthless paper, and permitting their favorites to overdraw their accounts to large amounts." It charges that after the suspension of the bank it discounted and guarantied paper to a large amount out of the funds of the depositors, much of the paper being worthless, a list of such paper being exhibited. It charges that the directors permitted President Bossieux to transact a portion of the business of the bank in his individual name. It charges that the directors so neglected their duties as to permit Cashier Armstead, in 1872 and 1873, to be in default in his cash to the amount of $9,162; and as to permit the president and cashier to guaranty the paper of A. A. Hutchinson (whose account at the time was overdrawn $15,000) to the amount of $3,845, as a list exhibited sets forth. It charges that during the years 1872 and 1873 the directors, through neglect, were in absolute ignorance of the condition of the bank, and yet made and published the reports upon its condition, which appeared in the public prints of the times, copies of which are exhibited; and that this ignorance, and the fallacy of these reports, are virtually confessed by the directors in a report of a committee of their body, made on the eleventh of December, 1873, in which they say that they cannot make a report of the condition of the bank in consequence of the inaccuracies in the books of the bank, which report caused an assignment by the stockholders of the effects of the bank in liquidation.

The bill charges that the directors so neglected their duties as to permit the president, cashier, and book-keeper to so negligently keep the books of the bank between its suspension in September, 1873, and the assignment in January, 1874, that no dates appear to the entries made, and the bill charges

that heavy loss has been incurred by the bank in consequence of such omissions. It charges that Armstead, the cashier, is in default to the bank in the sum of $9,162, and that other losses have occurred to the bank in consequence of certain of his acts; that he is utterly insolvent, and that the directors are responsible for the default and the losses referred to. Such, in condensed form, are the allegations of the bill, which the demurrer of the defendants admits to be true for the purpose of pleading. I am to assume that they are true, in considering the questions raised by the demurrer.

In what will be said further on in this opinion all the several objections of the demurrer, except that mentioned in the third specification, will be either virtually or expressly considered. It is objected in this third specification that the causes of action set out in the bill did not accrue within two years before the institution of this suit. This objection is not well taken. It is not necessary that a cause of action should originally accrue or arise within two years before suit is brought by an assignee in bankruptcy. It is only necessary that it shall exist at the filing of the petition in bankruptcy; and that suit upon it shall be brought by the assignee within two years after his appointment to office. It is settled law (*In re Eldridge & Co.* 2 Hughes, 256) that "the effect in bankruptcy of the petition, the adjudication, and the assignment is to vest the assets in the assignee as a trust, against which the statute of limitations ceases to run" from the date of the petition. Assuming that the right of action existed, as in this case, at the date of the petition in bankruptcy, then the assignee in bankruptcy (the trustees here) has a right to sue within two years "from the time when the cause of action accrued for or against such assignee," that time being the date of the appointment and qualification of the assignee. The third specification of the demurrer must, therefore, be overruled, for this bill was filed on the first of April, 1876, and the court will take judicial notice of the fact that the trustees were appointed more than ten days after the twenty-eighth day of March, 1874, the day of adjudication.

Without alluding further at present to the other specifica-

tions of the demurrer, chiefly technical, I shall proceed to consider those which go to the merits of the bill and embody the substance of the defence.

The substantial objection of the defence is that the trustees in bankruptcy, who are the complainants in this suit, have no right of action, no authority to sue, no interest entitling them to pursue the defendants, in this court or cause, either at law or in equity; and that, if they have a right to sue at all, it is at law and not in equity. The preliminary inquiry is whether the complainants have a right to sue at all. This right depends upon section 5046 of the United States Revised Statutes, which is as follows:

"All the property conveyed by the bankrupt in fraud of his creditors; all rights in equity, choses in action, patent-rights and copyrights; all debts due him, or any person for his use, and all liens and securities therefor; and all rights of action which he had against any person arising from contract, or for the unlawful taking or detention, or injury to, the property of the bankrupt; and all his rights of redeeming such property or estate, together with the like right, title, power, and authority to sell, manage, dispose of, sue for, and recover or defend the same, as the bankrupt might have had if no assignment had been made, shall, in virtue of the adjudication in bankruptcy, and the appointment of his assignee, but subject to the exceptions contained in the preceding section, be at once vested in such assignee."

Another section (5103) provides that trustees shall have all the rights and powers of assignees in bankruptcy. Another section (5047) provides that the assignee shall have the like remedy to recover all the estate, debts, and effects in his own name as the debtor might have had if he had remained solvent.

The language of section 5046 is very broad. It vests in the assignee in bankruptcy, amongst other things, "all rights in equity and choses in action;" "all debts due the bankrupt, or any person for his use;" "all his rights of action for property or estate, real or personal," and "for any cause of action arising from contract," and from "the unlawful taking or de-

tention" of the property of the bankrupt, and from "injury to the property of the bankrupt;" "together with the like right to sue for and recover the same as the bankrupt might have had" but for the bankruptcy.

It will be observed that there are two limitations of the assignee's power of suit, which are—*First*, that the thing sought to be recovered shall be such as, when recovered, shall be assets of the estate; and, *second*, that the action brought shall not be an action of tort for damages, such as at common law is strictly personal, and dies with the person. Beyond these two exceptions it is difficult to imagine how powers of civil suit, whether in equity or at law, could be more ample than are conferred by this section of the bankruptcy law of congress.

The question whether the assignee may sue resolves itself, therefore, into the question whether or not the fruit of the suit, if there be a recovery, shall come to the complainants as assets of the estate of the bankrupt. The law itself settles this question, for it expressly provides that all rights in equity, all choses in action, and all causes of action arising from the unlawful taking or detention of the property of the bankrupt, and from injury to the said property, shall "vest in" the assignee in bankruptcy.

The bill in this case sets out various instances of the unlawful taking of the property of the bankrupt, and enumerates repeated acts ruinously injurious to the estate. Even if the language of the act relating to the taking, detention, and injury of property was intended by congress to apply only to material "property," and not to money, credits, commercial paper, and stocks, the representatives of property; still, in vesting in the assignee all "rights in equity," "choses in action," and "rights of personal action," the law necessarily vested, along with them, the fruits of those rights and actions when availed of by suit.

In *Sawyer* v. *Hoag*, 17 Wall. 619, in the United States supreme court, Mr. Justice Miller said for the court: "The assignee is the representative of the creditors as well as the bankrupt. He is appointed by the creditors. The statute is

full of authority to him to sue for and recover property, rights, and credits where the bankrupt could not have sustained the action, and to set aside as void transactions by which the bankrupt himself would be bound." This passage is quoted to show how large the powers of the assignee in bankruptcy are considered to be by the court of highest authority in the land, and that they embrace not only the right of the assignee to sue where the bankrupt, if he had remained solvent, could have sued, but the right to sue in a large class of cases also in which the bankrupt could not have sued. So that I think it is plain that the statute vests the fruits of the rights in equity and choses in action, which it authorizes assignees in bankruptcy to sue upon, in the assignee, as assets of the bankruptcy estate, and makes the fruit of the present suit, if successful, such assets.

The law, as before remarked, does not authorize assignees in bankruptcy to bring actions of tort for damages, such as the bankrupt himself might have brought. But the present suit is not an action at law in tort for damages either in form or theory. It is a proceeding in equity, in which complainants set out how the property and capital of the bankrupt was squandered in numerous instances; charge the defendants with responsibility for the losses described; and demand, not damages either in name or nature, but restitution of funds lost through imbecile inattention and reckless negligence.

The suit falls within the broad terms of section 5046 of the bankruptcy act, and is not within either of the limitations which narrow the provisions of that law.

Assuming, then, that complainants had a right to sue, we have to inquire whether they should not have sued at law, and can maintain their bill in equity. The authorities cited by counsel for the defence, against the competency of complainants to maintain their suit, do not seem to me to establish the points for which they contend.

The case of *Re Crockett and Schramme,* 2 Am. Law Times Repts. 21, Bankruptcy Division, settles nothing as to the case at bar. That was a proceeding of a bankrupt firm to subject a former member of their partnership to bankruptcy.

The case is imperfectly reported, but I gather that one of the questions was whether a suit in tort for damages, which had been instituted by the firm before its bankruptcy, constituted a part of the assets in bankruptcy. The judge (Blatchford) spoke of the suit as "an action of tort for fraud and deceit." It was a separate suit, pending independently of the bankruptcy proceeding, in another forum; and the bankruptcy court merely held that it could not consider a contingent right for damages, such as was represented by that suit, as part of the partnership assets proper to be estimated in determining whether to adjudge a former member of the firm a bankrupt, in a proceeding in involuntary bankruptcy.

In the case of *Dutcher, Assignee, etc.*, 12 Blatchf. 435, the assignee brought suit in equity against the stockholders of the bankrupt institution, to recover of them an amount equal to the par value of their shares, for which a statute of New York made them liable. But that statute, in creating such liability, did not make the amount for which they were thus liable part of the assets of the bank. On this express ground, that the sum recovered by the assignee would not be assets in his hands, the court held that the assignee had no right to sue, and dismissed the bill. Obviously such a ruling can have no bearing adverse to the complainants in this cause, who sue for moneys vested by law, if recovered, in themselves as assets of the estate.

Another case, and one of the highest authority, relied upon by counsel for the defence, is that of *Spering's Appeal*, 71 Pa. St. 11, in which Judge Sharswood delivered the opinion of the court. That was a suit in equity, brought by the assignee, under a voluntary deed of assignment made by a bank, against the directors, and others alleged to be connected with them, to make good losses caused by an alleged mismanagement. The bill was brought in 1867, and was based upon transactions running back as far as 1850. The court refused to hold the defendants liable, on special grounds, one of which was the lapse of time. The bill was dismissed on grounds which do not enter into the case we are now dealing with. But the Pennsylvania supreme court, while so ruling, gave a

very sound exposition of the law touching the liability of directors of corporations whose funds have been wasted and capital squandered.   Judge Sharswood said : "I have found no judgment or decree which has held directors to account, except where they have themselves been personally guilty of some fraud on the corporation, or have known and connived at some fraud in others, or in which such fraud might have been prevented had they given ordinary attention to their ·duties.   I do not mean to say, by any means, that their responsibility is limited to these cases, and that there might not exist such a case of negligence, or of acts *ultra vires*, as would make perfectly honest directors personally responsible."

The proofs in the case he was then deciding did not, of course, fall within the category he enumerates of delinquencies which would, in his opinion, make directors personally liable.   The judge goes on, in another place, to say : "While directors are personally responsible to their stockholders for any losses resulting from fraud, embezzlement, wilful misconduct, or breach of trust for their own benefit and not for the benefit of the stockholders, and for gross inattention and negligence, by which such fraud or misconduct has been perpetrated by agents, officers, or co-directors, yet they are not liable for mistakes of judgment, even though they may be so gross as to appear to us absurd and ridiculous, provided they are honest, and provided they are fairly within the scope of the powers and discretion confided [by law] to the managing body."

From this decision it appears that directors are liable for— *First,* fraud or embezzlement committed by themselves; *second,* wilful misconduct or breach of trust committed for their own benefit and not for the benefit of the stockholders; *third,* acts *ultra vires*—that is to say, acts beyond the chartered powers of the corporations which they manage, and beyond the general powers conferred by law upon corporations; and, *fourth,* gross inattention and negligence, allowing fraud or misconduct on the part of agents, officers, or co-directors,

which could have been prevented if they had given ordinary care and attention to their duties.

The bill in the present case makes no charge against the defendants as to the first three of the grounds of liability thus set out. It does not charge personal fraud or embezzlement; it does not charge wilful misconduct or breach of trust committed for their own personal benefit at the expense of the interests of their corporation. It does not charge acts *ultra vires*, unless, indeed, as is doubtless the case, the unlawful declaration and payment of dividends out of capital stock and deposits fall within that designation. But it does charge throughout, such gross inattention and negligence on the part of defendants as allowed fraud and waste and ruinous injury to be committed, during two years of looseness and license, by officers, agents, and co-directors, who were under their control. Clearly, therefore, although the case of *Spering's Appeal* did show a dismissal of a bill in many of its features like that of the bill under consideration, yet the eminent court, in doing so, placed its ruling on grounds not belonging to the present case; and in its enumeration of acts, for which it was of opinion that directors of a bank would be personally liable, included the grounds on which this suit is brought.

It will abundantly appear, from authorities and reported cases to be cited in the sequel, that the managing officers of corporations are personally liable for the results of gross negligence, or what the jurists call *crassa negligentia*. If, by reckless inattention to the duties confided to them by their corporation, frauds and misconduct are perpetrated by officers, agents, and co-directors, which ordinary care on their part would have prevented, then I think it may be said with truth that it is now elementary law, to be found in all the books, that directors are personally liable for the losses resulting. Moreover, all authorities now tend to the conclusion that directors of banks and other moneyed corporations hold the relation to stockholders, depositors, and creditors of trustees to *cestuis que trust*, and as such are personally responsible for

frauds and losses resulting from gross negligence and inattention to the duties of their trust. See, besides those which will be produced further on in this discussion, the cases cited in the second edition of Green's Brice's Ultra Vires, 478, 484, 485, in text and notes.

The law makes them trustees, and holds them responsible as such, from the necessity of the case. And as it holds them liable for frauds and embezzlements committed in person, so it is obliged to hold them liable for like delinquences committed by others, when permitted by their negligence. It is true that in the latter case, where the breach of faith is only passive and not positive, equity, which looks to the conscience, although holding them liable, will treat them with all the leniency in its power by requiring those primarily bound to make restitution before calling upon them.

A most lucid and sound writer on the subject—see Goldsmith's Equity, (6th Ed.) 274—says: "The rule is that trustees will be held accountable to their *cestuis que trust* for any breach of trust arising from negligence, or gross misapplication of the trust property; but where there has been no *mala fides* on the part of the trustee, the court will not deal severely with him upon slight grounds, and will, therefore, in such case, endeavor to discharge him from any mischief that may arise from a misapplication of the trust money."

It must be borne in mind that, in respect to frauds and misapplications of money committed in consequence of the negligence of directors, and frauds and misapplications committed by directors themselves, the evil and loss are the same to the corporations whose affairs are entrusted to their management. To these corporations it matters little where the moral guilt lies. The result is the same, whether that guilt attach to the directors themselves or to the officers to whom they gave a license which was abused. And hence the supreme court of appeals of Virginia very well said, in the case of *Jones's Executors* v. *Clark*, 25 Grattan, 655, that there "may be such gross negligence as may be equivalent to fraud;" a proposition which is quoted approvingly by the United States supreme court in *Neal* v. *Clark*, 95 U. S. 707. And I

think it is a sound proposition of law that, whenever there would be liability if the fraud had been practiced by directors themselves upon the complainant, there is like liability if there has been that gross negligence on the part of directors which has permitted the fraud to be practiced by officers under their control. And unless we treat gross negligence, allowing fraud by such officers, as the equivalent of fraud committed in person, the proposition of counsel for defence, that directors are not personally liable for acts short of fraud and of *ultra vires*, is not sound. With this qualification, however, I am willing to admit the soundness of the principle.

It may as well be noted here, however, that the bill in this suit charges that there were repeated declarations and payments of dividends out of capital stock, which is prohibited by sections 32 and 33 of chapter 57 of the Code of Virginia, and is, therefore, *ultra vires*. Not unmindful of this feature of the bill, I shall in general treat it as a bill based upon charges of gross negligence. It is hardly necessary to premise that if the bill charges gross negligence, equivalent to fraud in its results to the bank, and if the authorities to be cited show that directors are, in their relation to depositors, creditors, and stockholders, trustees of the capital and funds with which they are entrusted, then, even though it could be shown that directors are liable to be sued at law, yet that fact does not oust equity of the jurisdiction which it has by virtue of its original jurisdiction of trusts and frauds; the remedy at law, where it exists, being cumulative and not exclusive.

Another case relied upon by counsel for the defence is that of *Overend, Gurney & Co.* v. *Gurney,* 4 Ch. App. Cases, L. R. 701. But that was a case in which the director defendant was charged, not with fraud, not with embezzlement, not with wilful misconduct or breach of trust, for his own advantage, at the company's expense; not with acts *ultra vires*, nor even with gross negligence, whereby fraud and misconduct were permitted in officers or co-directors; but the complaint there was, as the lord chancellor himself said, merely of "want of wisdom and want of judgment," and the bill sought "solely on that ground" to fix the defendant director with liability for

the resulting losses.  In that case the director sued had been authorized by the stockholders to engage in a hazardous speculation, and the speculation had proved abortive.  Surely, the decision of the court to dismiss the bill in that case can supply no persuasive argument to this court in favor of dismissing the present bill.  But I believe that case is also relied upon because of a remark thrown out *passim* by the lord chancellor to the effect that whatever remedy there might be for the company in the case, would be "an action at law for negligence."  A *dictum* of that sort thrown out in the most casual manner, supported by no statement of the grounds of it, and possibly resting upon some provision of the English statute law giving the right of suing at law for damages resulting from the mis or mal-management of directors, can have no weight as authority in another jurisdiction not having the benefit of such a statutory provision.

The statute law, under which the proceeding at bar is had, empowers the trustees in bankruptcy to sue upon their equitable rights, and does not authorize an action of tort for damages from negligence to be brought.  The right to sue at common law in this case could only exist by virtue of a statute.  Actions at common law cannot be brought upon contracts except by persons in legal privity.  The assignee of a contract cannot sue except by statute authority; and none but the immediate subject of a tort can sue at common law.  And, therefore, in this case, where the losses were not directly caused by the negligence of the defendants, but were the result of acts of officers committed in consequence of the negligence of the directors, no action at law in tort lies; certainly not for the assignees of the injured corporation.

Another case relied on by counsel for the defence is that of the *Franklin Ins. Co.* v. *Jenkins*, 3 Wend. 130.  Here the company, through its board of directors, sued four previous directors at law in tort, claiming damages for waste and loss of moneys, credits, and effects of the company.  The board consisted of 16 directors, and the law required the concurrence of a majority of the 16 to render valid any act of the body.  As there were but four of the directors sued, and but

four charged with malfeasance, their acts were clearly individ-
ual, and not official. Accordingly, the court held the demur-
rer to the declaration good, and dismissed the suit, saying
that "if the defendants are liable at all upon the allegations
contained in the declaration, they are liable individually and
severally, and not jointly, as directors;" meaning to say that
if they were liable at all in that suit. The court also said
that this being an action at law, it could not extend to the
conscience; implying that, therefore, it was a case for equity;
law looking to what is written in the statute or contract,
equity to what is written in the conscience.

The case shows how inadequate the machinery of the com-
mon-law courts often is to meet the needs of modern civili-
zation. Originally the chief object of its rules of pleading
was to reduce every case to a single issue of fact for the de-
cision of a jury of mediocre intelligence. The simple trans-
actions of early times could be readily adjudicated under such
a system. But the multiform, varied, and complicated affairs
of our commercial age are continually presenting cases,
most of them of great magnitude and complication, which do
not admit of adjustment to the rigid and inelastic machinery
of the ancient practice and pleading at law. The genius of
modern law judges has much liberalized and expanded the
system, especially by enlarging the scope of actions of *as-
sumpsit*, and its *indebitatus* counts; and many remedies have
been given by statute which were unknown to the common
law. But these expedients have only ameliorated the system;
they have not and cannot bring it into full adaptation to all
the exigencies of modern litigation. Nor is it necessary that
this should be; its deficiencies being supplied by the equity
jurisdiction, exercised as an adjunct, and not as a substitute.
So important is it to preserve the trial by jury in civil causes,
wherever the ends of justice can be attained under the sys-
tem of common-law pleading, that the procedure is pre-
served and suits are required to be brought at law in nearly
all cases in which it is competent to afford relief. Beyond
these, equity is relied upon to afford the needful redress; and
equity is the all-sufficient supplement of the law. Equi-

ty has never endeavored more than this ancillary office, and in that, its true function, it has been amply efficient. From the origin of its jurisdiction it has supplied such remedies only as the common law could not furnish. It arose with the birth of commerce, and its jurisdiction has expanded as commerce has grown and civilization advanced. It has, in cautious and conservative spirit, diligently adapted itself to meet the new-born wants, and to provide for the more and more complicated conditions, of modern society. And now there are few transactions deserving redress which its powers will not reach, and few ends of justice, otherwise unattainable, which it will refuse to subserve on excuses of technical inaptitude. The cases cited in the sequel of this opinion are but a few of the many which show the comprehensiveness of its modern jurisdiction.

In support of the views which have been expressed in what has been said I will proceed now to state with some detail the purport of some of the many authorities which bear upon the questions raised by the demurrer; and I here remark that I have seldom known a bill supported by so great a wealth of authority. That the remedy in this case was not an action at law, but by bill in equity, will abundantly appear from the following cases. [Here the opinion cites and sets out the purport of *Smith* v. *Hurd*, 12 Met. 371; *Allen* v. *Curtis*, 26 Conn. 456; *Citizens' Loan Ass'n* v. *Lyon*, 29 N. J. Eq. 110; and *Vose* v. *Grant*, 15 Mass. 21.] In this case the supreme court of Massachusetts, after deciding that an action at law on the case in tort will not lie by a bill holder against a stockholder of a bank which had distributed her capital without providing for its outstanding notes, that remedy being given by statute against stockholders, goes on to say: "This is one of the numerous cases which are constantly occurring that show the necessity of a court of chancery for the complete distribution of justice among the people. It is the boast of the common law that it permits no wrong without furnishing a remedy. But this is true only where there are courts competent to exercise all the judicial power which that law requires for its due administration. A court of chancery exercises a

most important part of those judicial powers. Its duty is not to establish new rules, unknown to the common law, for the conduct of the people or the regulation of their property, but to apply and enforce those principles of the common law which cannot be enforced by the other courts. In the case of this bank a court of chancery will probably sustain a bill by one or more of the stockholders for the benefit of all."

The cases of *Merchants' Bank of Newberryport* v. *Stevenson*, 10 Gray, 232, and *Spence* v. *Rogers*, 11 M. & W. 191, are also cited; in the latter of which it was held that the assignee in bankruptcy may sue at law for injuries affecting the bankrupt's property, so far as they do not involve such damages to his person as he might sue for irrespectively of injury to his property; but that the assignee could not sue for torts, because of the rule *actio personalis moritur cum persona;* nor on contracts affecting the person only.

The case of *Attorney General* v. *Aspinall*, 2 M. & C. 613, is one of a numerous class which decide that the ordinary jurisdiction of chancery over trustees and trusts is not ousted by special remedies or proceedings at law prescribed by statute in cases of breach of trust.

That directors are trustees; that equity has jurisdiction of suits against them by virtue of its original cognizance of trusts; that they are liable separately and jointly for the losses resulting from fraud and negligence; that they may be sued by their corporation, or by one or more of its stockholders, or by one or more of the company's creditors, and that they may be made defendants in a bill along with other persons who are not directors; in short, that a court of equity, trampling under foot all technical pleas and excuses, will go straight to the wrong, and shape its remedy to suit every case demanding its intervention, will abundantly appear from the following review of authorities:

Judge Story, (Equity Jurisprudence, § 1252,) after saying that the property of a corporation will be held affected with a trust, primarily for the creditors and secondarily for the stockholders; and that, where dividends have been paid in diminution of the capital stock, every stockholder is liable *pro rata*

to contribution for the restoration of the fund, adds: "This, however, is a remedy which can be obtained in equity only; for a court of common law is incapable of administering any just relief, since it has no power of bringing all the proper parties before the court, or of ascertaining the full amount of the debts, the mode of contribution, the number of the contributors, or the cross equities and liabilities which may be absolutely required for a proper adjustment of the rights of all parties, as well as of the creditors." Surely, if this be so, where stockholders are sued for a waste of the trust fund, *a fortiori* is it so where directors who were the perpetrators or permitters of the waste are sued.

[The opinion then cites and abbreviates the cases of *Aberdeen R. Co.* v. *Blaikie Bros.* 1 McQueen, 461; *C. & L. R. Co.* v. *Winslow*, Zinn's Lead. Cases in Trusts, 466; *Cooper* v. *Johnson*, Third District Court of Louisiana, not reported; and *First Nat. Bank of the Republic* v. *Gregg*, 9 Pittsburg Law Journal, 26.] This responsibility not only exists on general principles of equity jurisprudence, but in regard to dividends, it exists also in Virginia by statute, it being enacted by chapter 57, § 33, of the Code of Virginia, as follows: "If the board of directors shall declare a dividend of any part of the capital stock of the company, all the members of the board who shall be present, and not dissent therefrom, shall, in their individual capacity, be jointly and severally liable to the company's creditors for the amount of the capital so divided, and may be decreed against therefor on a bill in equity filed on behalf of such creditors; and, moreover, each stockholder who shall participate, etc., shall be liable," etc. As before shown, this statutory liability is, as to the remedy, cumulative, upon the liability to which equity holds trustees, and does not substitute or displace that liability.

In *Robinson* v. *Smith*, 3 Paige, 322, it was held that the directors of a corporation who wilfully abuse their trust or misapply the funds of the company, by which a loss is sustained, are personally liable, as trustees, to make good that loss, and they are also liable if they suffer the corporate

funds to be lost or wasted through gross negligence and inattention to the duties of their trust.

In *Peabody* v. *Flint*, 6 Allen, 52, which was a suit in equity by some stockholders against directors, the court say that in the discovery of frauds, and in furnishing remedies to parties defrauded, equity cannot suffer technicalities to stand in the way, but seizes upon the substance of the case and holds all parties to their just responsibility, following trust property into the hands of remote grantees and purchasers who have taken it with notice of the trust, in order to subject it to the trust.

In *March* v. *Eastern R. Co.* 40 N. H. 548, where the parties were in similar relations, the court entertained a bill to enjoin, etc.

In *Heath* v. *The Erie R. Co.* 8 Blatchf. 348, it was held that if several trustees are all of them implicated in a common breach of trust, for which the *cestui que trust* seeks relief in equity, he may bring suit against all of them, or against any of them separately, at his election, the tort being treated as several as well as joint. This suit was brought in equity by eight share-holders, who were foreigners. They made the company and three of its directors defendants, thirteen other directors not being brought in as such. The bill was sustained, and the relief asked for granted.

In *Curran* v. *Bank of Arkansas*, 15 How. 311, it is said by the United States supreme court that it being "once admitted that the property of an insolvent corporation, while under the management of its officers, is a trust fund in their hands for the benefit of creditors, it follows that a court of equity, which never allows a trust to fail for want of a trustee, would see to the execution of that trust, although, by the dissolution of that corporation, the legal title to its property had been changed."

[The cases of *Hodges* v. *New England Screw Co.* 1 R. I. 312; *Taylor* v. *The Maine Exporting Co.* 5 Ohio, 162; *Brown* v. *Van Dyke*, 8 N. J. Eq. 795; *Lexington & Ohio R. Co.* v. *Bridges*, 7 B. Monroe, 556; *Bank of St. Mary's* v. *St. John*, 25

Ala. 566; *United Society of Shakers* v. *Underwood*, 9 Bush, 609; and *Wood* v. *Dummer*, 3 Mason, 308, are cited, to show the proper remedy to be in equity, on the ground that directors are trustees, and the property of corporations trust funds.]

In *Koehler* v. *The Black River, etc., Co.* 2 Black, 715, it was held by the United States supreme court that the officers and directors of a corporate body are trustees of the stockholders, and, in securing to themselves an advantage not common to all the stockholders, they commit a plain breach of trust. In that case the court quote and adopt as law the following passage from section 312 of Angell & Ames on Corporations: "The directors are the trustees or managing partners, [of a corporation,] and the stockholders are the *cestuis que trust*, and have a joint interest in all the property and effects of the corporation, and no injury that the stockholders may sustain by a fraudulent breach of trust can, upon the general principles of equity, be suffered to pass without a remedy."

[After citing *Dodge* v. *Woolsey*, 18 How. 331, the opinion mentions the case of *Curran* v. *Bank of Arkansas*, 15 How. 312, in which the United States supreme court adopted the language of Judge Kent, (2 Com. 307, note *b*,) as follows: "The received doctrine now is, as shown by the statutes and judicial decisions, that the capital and debts of banking and other moneyed corporations constitute a trust fund and pledge for the payment of its creditors and stockholders; and a court of equity will lay hold of the fund, and see that it is duly collected and applied."

Other cases of the same purport are here cited, viz.: *Attorney General* v. *Dixie*, 13 Vesey, 519; *Attorney General* v. *Kerr*, 2 Beav. 453; *Bank of Gibraltar, etc.*, 1 Ch. App. L. R. 72; *Grim* v. *Barrett*, 1 Simons, 45; *Cochran* v. *Coalbrook Ry. Co. Ex parte Bennett*, 18 Beav. 339; *Luxembourg Ry. Co.* v. *Magnay*, 25 Beav. 586; *Maxwell* v. *Port, Tenant & Co.* 24 Beav. 495; *Salomons* v. *Laing*, 12 Beav. 339; *York & North Midland Co.* v. *Hudson*, 16 Beav. 495; *Gray* v. *Lewis*, 8 Eq. Cases, L. R. 526; *Atwood* v. *Merryweather*, 5 Eq. Cases, L. R. 464; *Bloxom* v. *Metropolitan Ry. Co.* 3 Ch. App. L. R. 337; *Hoole*

v. *Great West. Ry. Co.* Id. 262; and *Gregory* v. *Patchett,* 33 Beav. 595, explaining *Foss* v. *Harbottle,* 2 Hare, 461, and *Mozley* v. *Alston,* 1 Phillips, 790.]

I will conclude this review of cases by citing the early, leading, and important one of the *Charitable Corporation, etc.,* v. *Sutton,* 2 Atkins, 401. The company brought a bill against its committee men (directors) and other officers, praying to be relieved of their services, and to have satisfaction for breaches of trust, fraud, and mismanagement. The transactions complained of ran through a series of years, and were committed, some by part of the defendants, some by others, causing losses, attributable, some to one or more defendants, some to others, making a case of various and complicated responsibility, especially as the charge was of non-feasance or neglect of duty as well as of malfeasance.

The court held that the bill would lie, and among other things decided—*First,* that a gross non-attendance in a director may make him guilty of the breaches of trust committed by officers and other directors; *second,* that a director's saying that he had no benefit from his office but such as was merely honorary, is no excuse for his want of diligence; and, *third,* that when a supine negligence appeared in all the board, by which a complicated loss has happened, they are all liable.

Considering that all the directors are liable, jointly and severally, in such a state of things, a bill seeking to make them so may not be amenable to the objection of multifariousness which would be open to that objection if the defendants were liable only severally. This point was decided by Lord Hardwicke in this case of the *Charitable Corporation,* and his words on the subject were very emphatic. He said: "Objection has been made that the court can make no decree upon these persons which will be just, for it is said every man's non-attendance or omission of duty is his own default, and that each particular person must bear such a proportion as is suitable to the loss arising from his particular neglect, which makes it a case out of the power of this court. Now, if this doctrine should prevail, it is laying the axe at

the root of the tree"—meaning that it would wholly destroy the power of equity to redress the evil. He continued: "But if, upon inquiry before the master, there should appear to be a supine negligence in all of them by which a gross complicated loss happens, I will never determine that they are not all guilty. Nor will I ever determine that a court of equity cannot lay hold of every breach of trust, let a person be guilty of it in a private or in a public capacity. The tribunals of the kingdom are wisely formed both of courts of law and equity, and for this reason there can be no injury but there must be a remedy in all or some of them, and therefore I will never determine that frauds of this kind are out of the reach of courts of law or equity, for an intolerable grievance would follow from such a determination." He referred the case, in all its complicated features, to the master to ascertain the respective liability of each director and officer, in order that each might be held liable for his own acts primarily, and afterwards the whole jointly.

I will do likewise in the present case. I will sign a decree overruling the demurrer on all points.