STONE, Receiver, v. ROTTMAN et al., Appellants.

Division Two, July 2, 1904.

1. BANK DIRECTORS: Negligence: Limitations. An action against directors of a bank for negligence in the management of the bank's affairs is barred in five years after the losses which were caused by their negligence occurred

2. ———: Liability of Directors: Gross Negligence. The directors of a bank and members of its discount and examining committees are liable for gross negligence and inattention to the duties imposed on them by reason of their position, in failing to exercise a proper control over the president or cashier in the matter of overdrafts and loans to insolvent persons. They are not liable solely on the ground of passive negligence, but for losses which were the natural and necessary consequences of their omission of duty they are liable.

3. ———: ———: ———: **Ignorance.** Want of knowledge of wrongdoing on the part of the cashier or president of the bank, will not excuse the directors from liability for the losses if that ignorance is the result of gross inattention.

4. ———: ———: ———: **Investments.** The investment of the bank's funds in a coal company is illegal, and if the bank permits that company to make overdrafts, the fact that the investment was illegal, is evidence that the directors, who knew all about the illegal investment, were negligent in permitting the overdrafts.

Appeal from St. Louis City Circuit Court.—*Hon. W. B. Douglas,* Judge.

AFFIRMED.

*Johnson, Houts, Marlatt & Hawes* for appellant.

(1) Bank directors serve without remuneration. They are liable only as mandataries. They are only responsible to their bank for fraud or such gross negligence as amounts to fraud. Briggs v. Spaulding, 141 U. S. 132; Spering's Appeal, 71 Pa. 11; Fusz v. Spaunhorst, 67 Mo. 256; Swentzel v. Bank, 147 Pa. St. 140; Movius v. Lee, 30 Fed. 307; Wheeler v. Bank, 75 Fed. 784; Wallace v. Bank, 15 S. W. 455; Coddington v. Canaday, 157 Ind. 243; Killen v. Barnes, 106 Wis. 574. (2) The Mullanphy Savings Bank had the right to take over the property of the Consumers Coal Company and to operate it, in order to make it productive and to satisfy the debt of the former owner of the property to the bank. The directors were not liable for the losses incurred in the conduct of the business so long as they acted in good faith for the protection of the bank. Morse on Banks & Banking (4 Ed.), sec. 78; Reynolds v. Simpson & Ledbetter, 74 Ga. 455. (3) A bank director is not liable for excusable mistakes concerning the law or for errors of judgment. Godbold v. Bank, 11 Ala. 191; Cockrill v. Abeles, 86 Fed. 505; Witters v. Sowles,

31 Fed. 1; Wallace v. Bank, 89 Tenn. 630; Watts Appeal, 78 Pa. 370; Hodges v. New England Screw Co., 53 Am. Dec. 624. (4) There was a fatal variance between the allegation of the petition and the proof adduced so far as it refers to the indebtedness of the Consumers Coal Company. An allegation of negligence can not be supported by proof of an intentional injury. 22 Ency. of Plead. & Prac. 591; O'Brien v. Loomis, 43 Mo. App. 29; Bindbeutel v. Railroad, 43 Mo. App. 463; Shearman & Redfield on Negligence (4 Ed.), secs. 5-7; Railroad v. Burdge, 94 Ind. 46; Railroad v. Smith, 98 Ind. 42; Harold v. Jones, 98 Ala. 348.

*Granville S. Hoss* and *Manton Davis* for respondent.

(1) Directors of a bank are liable to the bank, or its receiver, for losses sustained from improvident loans and advances, made by the directors recklessly and through their gross negligence. 1 Morawetz on Private Corporations (2 Ed.), secs. 552, 554; Morse on Banks and Banking (4 Ed.), sec. 128; 21 Am. and Eng. Ency. Law (2 Ed.), 876; Marshall v. Bank, 85 Va. 684; Bank v. Bosseiux, 3 Fed. 817; Hun v. Cary, 82 N. Y. 65; Brinkerhoff v. Bostwick, 88 N. Y. 52; Bank v. Hill, 56 Me. 389; Bank v. Hill, 148 Mo. 391. (2) Directors of a bank are ordinarily not liable for overdrafts allowed by its cashier. But, if they know, or by the exercise of reasonable diligence might know, that the cashier habitually and frequently allows irresponsible persons to overdraw, and thereafter such directors take no steps to prevent subsequent overdrafts, then they are liable to the bank or its receiver for losses on subsequent overdrafts, regardless of their knowledge of, or assent to them. Scott v. Depeyster, 1 Edw. Ch. 541; Percy v. Millaudon, 8 Mart. N. S. (La.) 68; Briggs v. Spaulding, 141 U. S. 132; Cook on Stock and Stock-

holders (5 Ed.), sec. 703; Williams v. McKay, 40 N. J. Eq. 196; Williams v. McKay, 46 N. J. Eq. 25; Ouderdirk v. Bank, 119 N. Y. 272; Cutting v. Marlor, 78 N. Y. 460; Bank v. Hill, 148 Mo. 392; Movius v. Lee, 30 Fed. 307; Campbell v. Watson, 50 Atl. 120; Wheeler v. Aiken County, etc., 75 Fed. 785; Morawetz on Private Corps. (2 Ed.), sec. 561; Bank Commissioners v. Bank of Buffalo, 6 Paige 497; Cox v. Robinson, 70 Fed. 763; State v. Satterly, 131 Mo. 491; Wallace v. Bank, 89 Tenn. 630. (3) A willful injury, creating an absolute liability therefor, does not arise unless not only the act causing the injury, but also its injurious consequences, were intentional. An intentional act, causing an unintentional injury, is negligence. Shearman and Redfield on Negligence (4 Ed.), secs. 5, 6; O'Brien v. Loomis, 43 Mo. App. 34; Bindbeutel v. Railroad, 43 Mo. App. 463; Railroad v. Burdge, 94 Ind. 46; Railroad v. Smith, 98 Ind. 42; Harold v. Jones, 98 Ala. 348; Holmes v. Atchison, 48 Mo. App. 79; Wharton on Law of Negligence, secs. 11, 15. (4) Though the Mullanphy Savings Bank purchased all the stock of the Consumers Coal Company, a corporation, the separate existence of the two corporations continued and the identity of the latter was not merged in the former. Cook on Stock and Stockholders (5 Ed.), sec. 709; Baldwin v. Canfield, 26 Minn. 43; Button v. Hoffman, 61 Wis. 20; Wilde v. Jenkins, 4 Paige 481; Humphreys v. McKissack, 140 U. S. 304; Fitzgerald v. Missouri Pacific, etc., 45 Fed. 812; Bank v. Bank, 155 Mo. 95; Randall v. Dudley, 111 Mich. 437; Harrington v. Connor, 51 Neb. 214; Gas Co. v. Kaufman & Straus, 105 Ky. 131; Banking Co. v. Eiseman, 19 L. R. A. 684. (5) The judgment of the trial court is correct, for the right party, and should be affirmed. Vaughan v. Daniels, 98 Mo. 232; Conley v. Doyle, 50 Mo. 235; Dunn v. Raley, 58 Mo. 134; Bridge Co. v. Ring, 58 Mo. 496; Wolfe v. Dyer, 95 Mo. 550; Barkley v. Cemetery Assn., 153 Mo. 317; Redman v. Adams, 165 Mo. 71.

FOX, J.—The judgment in this cause is predicated upon the first count in the petition. It sets out "the appointment and qualification of the plaintiff as receiver. In it the plaintiff charges that the defendants were negligent in the performance of their duties to the bank; that they neglected to observe the by-laws; that they failed at their meetings to faithfully and diligently enquire into the affairs of the bank and to ascertain the condition of the accounts and property of the bank; that the discount committees grossly neglected their duty, in that they approved of improvident and worthless loans to irresponsible and insolvent persons and companies; that the president and directors left the entire management of the bank to the cashier, who loaned the money of the bank as he saw fit to wholly irresponsible and insolvent persons, his personal friends, without security; that in the exercise of ordinary care in the performance of their duty the defendants could have prevented the cashier from paying out large sums of money to financially irresponsible persons and corporations."

These general charges of negligence are limited by certain specifications of negligence with reference to the accounts of four persons, to-wit: Consumers Coal Company, Schwartz Bros. Commission Company, Nolte & Dolch Fertilizer Company and T. S. Teuscher.

The plaintiff alleges:

That on the ——— day of November, 1886, there was organized what was known as the Consumers Coal Company, to sell coal, operate coal mines, etc. That the organization and launching of said enterprise was purely a speculative venture on the part of its promoters and that certain of the directors of said bank during the whole time of its operation and existence were owners, proprietors and managers of said coal company. The said corporation was started without capital, or the capital necessary to operate the same.

The said corporation, being insolvent from the beginning, the defendants herein, certain of whom were directors and officers of said coal company, in order to procure the necessary money wherewith to maintain the existence of said coal company, procured overdrafts to be drawn on the part of said coal company on the bank, which overdrafts were honored and cashed by the cashier of the bank. That from the first day of December, 1886, until the first day of March, 1896, said overdraft account gradually increased from month to month and from year to year until on the first day of July, 1895, said account aggregated the sum of $80,927.61. That after said sum was settled by note said coal company was again permitted to overdraw its account in the sum of $62,000, said last-mentioned overdrafts extending over a long period of time. And on that account $142,927.61 was and is lost to said bank and its creditors. That from the time of the organization of said coal company until it finally ceased to do business, it was an insolvent and bankrupt concern, and so known to be by those in charge of its management, as well as by the defendants herein, and that during the entire time of the existence of said company, it was a sink hole into which the money of the Mullanphy Savings Bank was being poured at the instigation and with the consent and upon the advice of the defendants herein for the purpose of endeavoring to extricate it from its insolvency and to save the money previously spent in the enterprise.

Further complaining that one T. S. Teuscher, of St. Louis, Missouri, then and ever since insolvent, had an account with the bank extending from the first of January, 1894, to April 6, 1896. That Teuscher was engaged in speculating in futures, buying and selling grain, whiskies and other commodities for future delivery; that said business was highly speculative and hazardous; that the defendants were fully acquainted with the character of the business and could have ascer-

tained the same at any time by examining into the character of Teuscher's account and of the vouchers from which the same was made up, as shown by the books of said Mullanphy Bank; that having the permission and consent of the defendants herein so to do, the said cashier of said bank permitted said T. S. Teuscher to become indebted to said bank without security by overdrawing his account with said bank in the sum of $175,-000. That the total amount of the security required of said Teuscher for all of said indebtedness was not worth more than the sum of $30,000, thus leaving a net loss to said Mullanphy Savings Bank on account of said line of loans to said Teuscher in the sum of $145,000. That on account of the grossly careless and negligent conduct of the defendant in permitting said Teuscher to so get possession of the money of said bank without security the sum of $145,000 was lost to said bank and its creditors.

That Schwartz Brothers Commission Company had had a running account with the bank from the year 1886 and prior thereto, to the date of the failure of the bank. That said commission company was engaged in the business of dealing in futures, buying and selling grain and other commodities for future delivery on account of their customers and also on their own account. That the business was purely speculative and admittedly hazardous. That the character of their business was known to the defendants for more than ten years last past, but that notwithstanding that fact, the cashier of the Mullanphy Bank, with the express and implied consent of the defendants, permitted said company to continue from the year 1890 to continually overdraw its account without giving any security therefor, knowing at the time that the entire amount of said indebtedness was liable to be lost on account of the hazardous and speculative business in which said commission company was engaged. That said commission company would be permitted to overdraw its account with

said bank until said overdraft account reached from $20,000 to $25,000, when a note would be taken for the account of said overdraft and said note approved by the defendants, whereupon said commission company would again be permitted to overdraw its said account until it would again run up to thousands of dollars, when a new note would be taken for the second overdraft, which said note would also be approved by the discount committee and sanctioned by the directors, defendants herein, the indebtedness increasing each year, until on the first day of July, 1894, the indebtedness of said commission company to said bank, in the matter of overdrafts alone, amounted to the sum of $31,000. That it was again permitted to overdraw its account extending over a period of three years from that date until said last-mentioned overdrafts reached the sum of $55,-000 which was due and owing from said commission company to said bank at the date of its seizure. That for all this indebtedness of Schwartz Brothers Commission Company to said bank the defendants took little or no security, or such securities as might have been known by and was known by defendants to be worthless or wholly inadequate to secure the credit extended to said commission company. That said Schwartz Brothers Commission Company at the time of contracting said indebtedness was insolvent. That the sum of $86,-000 loaned, negligently and unlawfully, in the manner aforesaid, to said company has been lost to the bank on account of the gross negligence of the defendants.

That on or about the ———— day of ————, 1891, the Mullanphy Bank became the owner of a certain plant and machinery used and operated for the purpose of manufacturing fertilizing material used in enriching cultivated lands, acquired in the collection of debts for which said plants, machinery, etc., had been given as security; that said bank sold for $60,000 the same to what was known as the Nolte & Dolch Fertilizer Company, then and ever since insolvent, a corporation in

which Nolte, a director in the bank, and Kammerer, the cashier, were large stockholders; that said plant, machinery, etc., was sold by said bank for more than its actual value upon a credit; consisting of its eight several promissory notes, aggregating $60,000, and delivered its deed of trust on said property to secure $30,-000; other than this, said Nolte & Dolch Fertilizer Company gave to said bank no security for said indebtedness. That said fertilizer company was, from the date of its purchase of said plant, an insolvent concern, which fact was well known to all the defendants, but that, notwithstanding said fact, they negligently permitted said fertilizer company to overdraw its account without security in large sums of money continuously every month, and many times every month, from the year 1893 down to the first day of March, 1897, and that the indebtedness of said fertilizer company was largely increased from the original amount of $60,000 to $80,-000, thereby making the loss sustained by said bank on account of said overdrafts $20,000 on account of the negligence of these defendants.

That during the entire period of time, when defendants negligently permitted said overdrafts on the part of the insolvent persons and corporations aforesaid to be paid, the defendants herein, with a view to concealing said fact from the bank, the public and the officers of the law, so manipulated their books, and so permitted the same to be manipulated that none of said overdrafts appeared upon the general daily balance book of said bank. That said conduct on the part of these defendants in so permitting the books of said Mullanphy Bank to be so kept as not to show a true and correct condition of the bank's affairs, was an act wrongfully and grossly negligent on their part and showed a total disregard of their duties to the stockholders and creditors of said bank. That on account of the grossly negligent, careless, wrongful and unfaithful conduct of the defendants as set forth, the bank has

been damaged in the loss of its assets in the full sum of $250,000 for which and for costs plaintiff, as receiver of said bank, prays judgment.

To this count the defendants pleaded the general denial and the five-year statute of limitation running from April 2, 1903.

On October 21, 1898, this cause was by proper order of record referred to Judge James A. Seddon as referee to try all the issues.

The referee proceeded to hear the evidence, and having completed such hearing, he, on March 4, 1901, filed with the court the testimony taken in the cause, together with his report and findings thereon.

The referee recommended in his report that a judgment be entered in favor of plaintiff and against the appellants in this cause for the sum of $57,665.16.

Defendants duly filed exceptions to the report of the referee, which were by the court overruled and judgment rendered upon the report.

From this judgment, the appeal in this cause was prosecuted and the record is now before us for review.

This action is predicated upon negligence of the directors and officers of the bank, and the first count of the petition restricts the acts of negligence to the four accounts mentioned in the petition.

*First*: *Consumers Coal Company.*

This was a corporation, the entire capital stock of which was hypothecated with the bank to secure a loan to one William Freudenau, amounting to $21,977.22. In 1889 this collateral was sold, the bank becoming the purchaser thereof, at a price equalling the amount of the loan, $21,977.22. This amount was then carried to the bank's investment account. One share each of this stock was transferred to defendants Elbrecht and Klages, who were put in as representatives of the bank to operate the coal company. "The bank actually sanctioned the extension of the business by leasing a new

mine." This coal mining and selling corporation was then run by the bank through the directors as officers of the coal company; the necessary funds being withdrawn from the bank in the form of overdrafts. "From the time the bank began to operate the coal company the business steadily ran behind. It was a losing venture from the start, and that fact became more and more apparent every day and every month of its operation."

In the operation of this business from its beginning in June, 1889, to January, 1891, there was lost to the bank, in addition to its original outlay, the sum of $54,639.48; from this time until August 7, 1891, there was a further loss of $10,140.01; from this time until December 2, 1892, the bank lost an additional $14,901.98, and in the three months from December 2, 1892, to April 2, 1893, a further loss of $5,426.13 accrued. On April 2, 1893, the original investment of $21,977 had so increased by subsequent losses that it then had reached the sum of $106,944.81. At this time the total assets of the coal corporation, as valued by these defendants themselves, did not exceed $55,000, but not content with this enormous loss they continued operations and thereafter a further loss of $31,106.89 accrued up to November 2, 1894; of $17,078.96 to January 18, 1895; of $6,247.36 to February 1, 1895.

There was a recession of $925.02 between February 1, and February 16, 1895, but this was more than offset by March 1.

Losses thereafter were, up to July 5, 1895, $3,410.13; up to January 10, 1896, $9,927.42; up to April 16, 1896, $1,779.80, when the total outlay, original investment and losses, amounted to $159,611.85, when operations seemed to have ceased, as the figures did not change from then until the close of the bank on March 1, 1897.

The total assets of this corporation, as estimated by the defendants, were not of value exceeding $55,000, at any time.

Klages, whose administrator is the only remaining appellant, was a director of the bank the whole time; and was on every examining committee save one; and was on the discount committee the whole time with the exception of six months in 1895; which last committee was the "managing committee of the bank;" and which committee, with the president and cashier, the referee finds "studiously suppressed all information in relation to the accounts of the Consumers Coal Company and concealed it from the directors who were not members of the committee."

"He was also the treasurer and a director of the coal company throughout."

*Second:* *Schwartz Brothers Commission Company.*

This company was engaged in the building and operating of grain elevators. They also owned all the stock of a steamboat line. As early as January, 1891, which is as far back as the inquiry of the referee went, it had an overdraft with the Mullanphy Savings Bank of $4,773.55. In December, 1892, it was $26,939.44, and April 1, 1893, $27,015.39; on October 26, 1894, $24,584.-94, when notes were given covering it. Immediately thereafter another overdraft began to accumulate which, on April 2, 1895, was $536.59, increasing later to $697.87, when notes were again given. Another overdraft amounting to $1,154.18 had accumulated July 5, 1895, when notes were given for it. The account was again almost continually overdrawn until the close of the bank when there was an overdraft of $3,566.40. On the several notes taken covering the different items of indebtedness of this company there was lost to the bank the sum of $66,953.26, and from the collateral given to secure them but $19,185.92 was realized. Yet the referee finds the "discount committee acted with proper care and prudence as a board in accepting them."

The referee finds that this company had a credit balance as late as May 18, 1896, on its open account

and also finds that neither the company nor its members were in such financial credit as to entitle them to any advance after January, 1896. But regardless of this, they were allowed after May, 1896, to wipe out their deposit and accumulate an overdraft amounting at the time of the bank's failure to $3,566.40.

"But the referee finds that though the overdrafts were taken up from time to time by good notes and the overdraft at the close of the bank was only $3,566.40, the cashier disregarded all rules of prudence in reference to the entire overdraft account of this company. That the company owed the bank $3,566.40 at its close was due to his gross carelessness."

*Third: Nolte & Dolch Fertilizer Company.*

The bank became the owner of a fertilizer plant by the sale of some collateral held by it. A corporation was organized by Louis Nolte, a director of the bank, and one E. W. Dolch; Kammerer, the bank's cashier, taking two shares nominally. To the Nolte-Dolch Fertilizer Company, the corporation so formed, the bank sold the fertilizer plant for $60,000 in notes; $30,000 signed by the corporation and secured by a deed of trust on the property purchased; $15,000 signed by Louis Nolte and secured by fertilizer company stock as collateral, and a like amount signed by E. W. Dolch with same security. This corporation had no cash as a working capital.

This corporation lived off the bank; on the first day of its existence it had an overdraft of $1,208.60, which was increased gradually until on January 1, 1892, it amounted to $13,027.38; on January 14, 1892, it was $14,641.81, when it was reduced by a note for $10,000.00 secured by a mortgage of the debtor's stock in trade. On January 28, 1893, the overdraft again reached the proportions of $23,173.49, which later was reduced by a note for $12,300, secured as the first. The overdraft beginning again, reached the sum of $11,139.16 in January, 1897, but similar notes were taken later, so that

the corporation's final overdraft at the bank's close amounted to but $487.52.

*Fourth*: *T. S. Teuscher*.

This party was a whiskey merchant in St. Louis. On April 2, 1893, he was a debtor of the Mullanphy Savings Bank in the sum of $33,470.02, on unobjectionable commercial paper and $233.40 on overdraft. The overdraft seems to have been kept within reasonable bounds until June 15, 1894, when he was allowed to overdraw his account $16,955.58, which overdraft continued in slightly varying amounts until June 29, 1894, when the overdraft was paid. After this, and until August 1, 1894, overdrafts in amounts varying from $5,449.64 to $50,057.09, existed against this party. Between July 16, 1894, and August 21, 1894, Teuscher was allowed to withdraw from the bank the sum of $218,547.36. This was on worthless checks made by Teuscher, paid by the bank and refused by the drawee, $55,000; cashier's checks issued by the bank, $9,000; worthless drafts on non-resident drawees, $43,547.36, and withdrawals of deposits credited but never actually made, $111,000. This so-called "defalcation" was reduced to $175,000 by payments forced from Teuscher, and for this sum his unsecured notes were taken. After these transactions, and when Teuscher was known to be insolvent, he was allowed from time to time to make further overdrafts, and when the bank closed in 1897, an overdraft of $944.20 existed. The allowing of these overdrafts, the referee finds "is not consistent with sound business principles," "improvident and hazardous." And "the conduct of the cashier in allowing T. S. Teuscher to overdraw his account between August 1, 1894, and December 11, 1895, was grossly careless and reprehensible."

The referee did not believe any liability arose against the defendants for any of the Teuscher claim, except the final overdraft of $944.20, and on this theory judgment was rendered.

Among the findings of the referee, the record discloses the following which is applicable to the appellant in this cause:

"The members of the examining committee as a committee were grossly negligent in not making the proper examinations of the conditions of the bank and in not reporting the same and in not reporting the facts known to them relating to the conduct of the cashier in making loans and the facts relating to these four accounts. If they had done their duty with even the slightest care and had insisted upon the affairs of the bank being managed on prudent business principles it would never have failed.

"The members of the discount and examining committees were grossly negligent of their duties in their individual capacities as directors in not properly supervising the action of the cashier and the president and in permitting the reckless conduct of these latter in allowing the bank to sink large sums in the coal business and in making loans to customers, especially to Schwartz Brothers Commission Company, Nolte & Dolch Fertilizer Company and T. S. Teuscher in the way of overdrafts without first having them approved by the discount committee and in failing to have the board take the proper action in reference to these matters.

"Messrs. Marks and Klages, from January 1, 1891, to February 27, 1897, knew of the conduct of the cashier in allowing overdrafts to customers as he saw fit; they knew all about the bank engaging in the coal business and assisted in embarking it in the enterprise. Klages, as cashier of the coal company, drew the money out of the bank which it invested in this enterprise. They knew about the overdrafts of the Nolte & Dolch Fertilizer Company, Schwartz Brothers Commission Company and T. S. Teuscher, though they did not know of the defalcation in July and August, 1894, until

it had occurred. They were closely associated with the active management of the affairs of the bank.

"None of the committee or directors ever made any formal report to the board showing the illegal conduct of the cashier in allowing overdrafts or the condition of these four accounts and took no steps to have the cashier removed or to cause him to amend his conduct. They practically left the management of the bank to the cashier, president, except in the matter of discounting paper, which was done by the discount committee.

"In the absence of any evidence to the contrary the referee finds that the discount committee was not chargeable with any neglect in the matter of discounting any note or notes in the account of the Schwartz Brothers Commission Company. They were all secured by collateral. In the absence of any evidence to the contrary and as to the value of said collateral, the referee finds that they were well secured and that the discount committee acted with proper care and prudence in their action as a board in accepting and discounting them. But the referee finds that though the overdrafts were taken up from time to time by good notes and the overdraft at the close of the bank was only $3,566.40, the cashier disregarded all rules of prudence in reference to the entire overdraft account of this company. That the company owed the bank $3,566.40 at its close was due to his gross carelessness.

"The discount committee, though charged only in the by-laws with the duty of discounting paper, were looked upon and acted as the managing committee of the bank. They had full opportunities to know the condition of the large accounts of the bank and especially the account of the Consumers Coal Company, Schwartz Brothers Commission Company, Nolte & Dolch Fertilizer Company and T. S. Teuscher. If they did not know the history and the condition of these accounts, their ignorance was the result of gross neglect. They

examined frequently the overdrafts on the individual daily balance book. The cashier did not undertake to discount paper, but with this exception the management of the bank was practically left, by all of the other officers and directors, in the hands of the cashier 'as the principal man.' He did undertake to loan to the customers of the bank, and especially to the four parties above mentioned, loans to any amount that he thought fit in the way of overdrafts. This course of conduct was not confined to these four accounts. It was known to the president and to the defendants, who were members of the discount committee, and of the examining committee. Had it not been known by them it would have been because of the grossest negligence upon the part of the members of these committees in the performance of their duties.

"The president from time to time objected to the conduct of the cashier in assuming to loan the money of the bank in the shape of overdrafts. He frequently made these objections and instructed the cashier to have the overdrafts made good and not allow any more. This was specially true in regard to the overdrafts of the Consumers Coal Company, Schwartz Brothers Commission Company, Nolte & Dolch Fertilizing Company and T. S. Teuscher.

"Klages and Marks both admitted that they knew of this course of conduct of the cashier, and that they themselves frequently spoke to the cashier about it, but he persistently ignored all instructions and warnings all the time, from January 1, 1891, to the close of the bank. They were ignored almost daily to the knowledge of the president and the members of the discount committee and also of the examining committee, yet the president did not remove the cashier nor did the president and members of the committee ever bring the matter to the attention of the board of directors, or take any steps to remove the cashier, or to cause him to desist from such illegal actions in loaning the money of

the bank without the approval of the discount committee or to protect the bank against loss.''

This is a sufficient reference to the findings of the referee to indicate the correctness or incorrectness of his conclusion of law.

### OPINION.

The conclusion of the referee, as disclosed in his report, is that the appellant in this cause was guilty of such negligence in the discharge of the duties imposed upon him by reason of the position he occupied in the bank, as rendered him liable to the plaintiff, who is the representative of the bank corporation.

The proposition confronting this court upon this appeal is simply narrowed down to the one question: Are the conclusions of law, by the referee, predicated upon his finding of facts, correct or incorrect?

The referee in this cause, after referring to the essential allegations in the first count in the petition upon which this judgment is based, proceeds in his report, as applicable to this case, to state his conclusions. They are thus clearly stated:

''The referee is of the opinion that the general charges of negligence are confined to the specific charges of negligence made in reference to the accounts of the Consumers Coal Company, Nolte & Dolch Fertilizer Company, Schwartz Brothers Commission Company and T. S. Teuscher. [Waldhier v. Railroad, 71 Mo. 514.]

''All of the parties acted upon this theory, as no attempt was made to establish negligence in reference to any other particular account than the four accounts above specified. To this count the defendants pleaded the general denial and the five-year statute of limitations running from April 2, 1893.

''The referee holds that this being an action for negligence the five-year statute of limitations is well

pleaded and that the defendants can not in any event be held liable for losses which resulted to the bank from the negligence of the defendants prior to April 2, 1893. [Williams v. Halliard, 38 N. J. Eq. 373; Wallace v. Bank, 89 Tenn. 648; Brinckerhoff v. Bostwick, 99 N. Y. 194; Spering's Appeal, 71 Pa. St. 11.]

"The question then on the first count is whether the defendants are liable for the losses to the bank on these four accounts accruing since the second of January, A. D. 1893.

"The first question to be solved is, what is the degree of care which the directors of a bank are bound to exercise in the performance of their duties? They may be liable for misfeasance or positive and active wrongdoing, or nonfeasance, the passive neglect to perform their duty.

"There is a marked difference between the duty which the directors of a bank owe to the bank and that which they owe to strangers or creditors. Much of the confusion in the cases will be removed, if they are examined with this distinction kept thoroughly in mind. In some of the cases the two duties have been hopelessly confounded.

"The relation of a corporation to a depositor is that of debtor and creditor arising from contract. Aside from statutory liability, which creates an individual cause of action in favor of creditors as a class, the directors of a corporation are not liable to creditors for mere nonfeasance. Aside from statutory liabilities they are not liable individually to depositors for mere nonfeasance. 'Nothing short of active participancy in a positively wrongful act intendedly operating injuriously to the party complaining (creditor) will give origin to individual liability.' [Fusz v. Spaunhorst, 67 Mo. 264.] Judge MARSHALL, in a very able opinion rendered in the case of Utley v. Hill, 155 Mo. 259, said: 'The relation of a depositor to a bank is that of ordinary debtor and creditor. "The relations

between the creditors and the corporation is that of contract, and not of trust.'' [Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. Reporter 924, 35 L. Ed. 662, followed in Bank v. Hill, 148 Mo. loc. cit. 396, 49 S. W. 1012.] ''But there is nothing, of either contract or trust, in all ordinary cases, to create any relation between the creditor and the directors.'' [Id.] Accordingly it was held in Bank v. Hill, supra (which was a suit by the creditors of this same bank against these same defendants to recover the deposits lost by the creditors by reason of the negligence of the defendants in managing the affairs of the bank), that there could be no recovery by depositors against directors of the bank because of negligence of the directors in managing the affairs of the bank; that the directors are liable for negligent performance of duty to the bank, or to its assignee or to a receiver thereof, but not to the creditors, because of want of privity of contract of duty between them. So, also, in Fusz v. Spaunhorst, 67 Mo. loc. cit. 264, 265, the same doctrine was announced by this court, speaking through SHERWOOD, J., and it was further pointed out that, aside from the statutory liability, directors were not liable individually to depositors for mere nonfeasance; that ''nothing short of active participancy in a positively wrongful act, intendedly and directly operating injuriously to the prejudice of the party complaining, will give origin to individual liability;'' that the injury must be ''occasioned by the malicious or fraudulent act of the party complained of.'' '

''Doubtless in a proper case the creditors might bring a suit in equity to subject to the payment of their demand claims of the corporation against directors for nonfeasance. But such a suit would be like any other suit to reach other older assets of the bank. Such a suit would be really prosecuted in the right of the bank. In this sense the receiver represents the creditors as

well as the bank and stockholders.    [Zane on Banking, sec. 86.]

"The referee is of the opinion that the evidence in support of the first count does not show a case of fraud or such gross negligence as amounts to fraud or willful neglect of duty and that there is shown in this count no individual liability of the defendants to the creditors.

"If there is any action at all against the defendants it arises from a mere omission to perform their duty.

"Nonfeasance consists in passive neglect to exercise the proper degree of care of directors in the performance of their duty.

"The referee is of the opinion that the directors of a bank are not to be charged as strict technical trustees. In a certain sense they are undoubtedly to be considered trustees, but only in that sense in which an agent or bailee entrusted with the care and management of property is considered a trustee.    A director more nearly resembles a managing partner.    [Spering's Appeal, 71 Pa. St. 11.]

"The degree of care directors are bound to exercise can not be better stated than in the opinion of Chief Justice FULLER in the leading case of Briggs v. Spaulding, 141 U. S. l. c. 150: 'No one of the defendants is charged with the misappropriation or misapplication of, or interference with, any property of the bank, nor with carelessness in respect to any particular property; but with the omission of duty, which, if performed, would have prevented certain losses, in respect of which complainant seeks to charge them. . . . Treated as a cause of action in favor of the corporation, a liability of this kind should not lightly be imposed in the absence of any element of positive misfeasance, and solely upon the ground of passive negligence; and it must be made to appear that the losses for which defendants are required to respond were the natural and necessary consequences of omission on their part.

. . . In any view the degree of care to which these defendants are bound is that which ordinarily prudent and diligent men would exercise under similar circumstances, and in determining that the restrictions of the statute and the usages of business should be taken into account. What may be negligence in one case may not be want of ordinary care in another, and the question of negligence is, therefore, ultimately a question of fact to be determined under all the circumstances.' And again, in the same case (page 165), he says: 'We hold that directors must exercise ordinary care and prudence in the administration of the affairs of the bank, and that this includes something more than officiating as figureheads. They are entitled under the law to commit the banking business, as defined, to their duly-authorized officers, but this does not absolve them from the duty of reasonable supervision, nor ought they to be permitted to be shielded from liability because of want of knowledge of wrongdoing, if that ignorance is the result of gross inattention.'

"Judge Hughes said in Trustees v. Bosseiux, 3 Fed. 817; s. c., 4 Hughes 387: 'If, by reckless inattention to the duties confided to them by their corporation, frauds and misconduct are perpetrated by officers, agents, and codirectors, which ordinary care on their part would have prevented, then, I think it may be said with truth that it is now elementary law, to be found in all the books, that directors are personally liable for the losses resulting, i. e., for gross negligence, or what the jurists call *crassa negligentia.*' [Stapleton v. Odell, 47 N. Y. Supp. 15; Savings Bank v. Caperton, 8 S. W. 885.]

"The referee is of the opinion that the director of a bank is only required to act in good faith and to exercise such a degree of care as a reasonably prudent man would exercise under the same circumstances. He is not bound to exercise the same degree of care which a prudent man would exercise in his own business. This

is too high a standard. 'To expect a director, under such circumstances, to give the affairs of the bank the same care that he takes of his own business, is unreasonable, and few responsible men would be willing to serve upon such terms. In the case of a city bank, doing a large business, he would be obliged to abandon his own affairs entirely. A business man generally understands the details of his own business, but a bank director can not grasp the details of a large bank without devoting all his time to it, to the utter neglect of his own affairs.' [Swentzel v. Penn Bank, 147 Pa. St. 140.]

"A director is expected to attend the meeting of the board with reasonable regularity and to exercise a general supervision and control. He is not required to know the details or contents of the books and papers. 'The framers of the organic and of the statute law must be held to have understood how the business of a bank is conducted. They must have known that the directors are drawn from the busiest men in the community; men who have carved success out of chaos, who have succeeded where the great multitude have failed; men who are not expected, and could not afford, to give their whole time to the business of the bank. The lawmakers knew that the active management of a bank usually devolves upon the president and cashier, and that to the latter is usually entrusted the management of the details. They knew that few directors had the time, and fewer still the capacity, to examine the books of a bank and ascertain its solvency; that even in their own business they could not take off a trial balance from the books they employed experts to keep for them, either because they had not the time to do so for themselves or because they did not have the capacity to do so.' [Utley v. Hill, 155 Mo. 1. c. 265; Queen v. Hincks, 10 Cent. L. J. 127 (cited in Thompson on Liability of Agents, etc., p. 477); Dunn v. Kyle, 14 Bush (Ky.) 134; Savings Bank v. Caperton, 87 Ky. 306.]

"The custom of appointing discount and examining committees to attend to the details of the management of the business of a bank is a reasonable one and one almost necessary in the conduct of banks in large cities where directors are drawn from the busiest men in the community who can not be expected to give sufficient time to grasp the details of the business. [Morse on Banking (3 Ed.), secs. 115, 116; Thompson on Liability of Officers and Agents, etc., p. 477, et seq.]

"Upon the orgnization of the Mullanphy Savings Bank by-laws were adopted. These provided for the creation of a discount and examining committee to whom were entrusted the duties of looking after details of the business management. These by-laws were afterwards, in January, 1880, early in the history of the bank, formally ratified by the stockholders. This mode of conducting the business of the bank was well established long before any of the defendants became members of the board. It is too late now to charge that it was not proper.

"The directors of a bank should exercise the greatest care and prudence in appointing the president, cashier and the members of the managing committee, and having used such care to select honest and capable men they can not be held liable as insurers of their fidelity. [Clews v. Bardon, 36 Fed. 621.]

"In the case of Percy v. Millaudon, 8 Mart. N. S. (La.), 68, cited with approval by the plaintiff in his brief, the court said: 'If nothing has come to their knowledge to awaken suspicion of the fidelity of the president and cashier, ordinary attention to the affairs of the institution is sufficient. If they become acquainted with any fact calculated to put prudent men on their guard, a degree of care commensurate with the evil to be avoided is required, and a want of that care certainly makes them responsible.' [Williams v. McKay, 40 N. J. Eq. 189; Movius v. Lee, 30 Fed. 298.]

"In the absence of any just ground of suspicion

that there is something wrong or dishonest going on in the bank, it is not negligence in the other directors to accept the statement of those specially charged with the duty of making those statements. As was said by Judge MONK in Queen v. Hincks, supra: 'The ordinary director must have confidence in his codirector until he suspects that there is something wrong or dishonest going on in the bank.'.

"On this point we can adopt the language of the highest court in this country as applicable to the case at bar with equal force as in the case in which it was used: 'They (directors) are not required to adopt any system of espionage over their officers (and committeemen), or to entertain any suspicion without some apparent reason and until some circumstance transpires to awaken a just apprehension of their want of integrity. They have a right to assume that they are honest and faithful. Should any circumstance transpire to awaken a just suspicion of their want of integrity, and it be suffered to pass unheeded, a different rule would prevail.' [Briggs v. Spaulding, 141 U. S. 9.]

"In treating his conclusion of the liability of the defendants under the facts found, the referee has been guided by the principles of the decision laid down in the case of Briggs v. Spaulding, supra, rather than by those laid down in the dissenting opinion in that case.

"Mr. Rottman was the president of the bank. He knew, and if he did not know, he could have known by the exercise of the slightest attention to his duties, the whole history of the account of the Consumers Coal Company with the bank and that the bank was carrying on a coal business which was like a rat hole, into which its money was being poured. The conduct of Rottman and of all the other parties who permitted the bank to invest the money which it did in this company was utterly reprehensible. It was entirely illegal to permit the bank to carry on this business one day, after there had elapsed a reasonable time to enable the bank to dis-

pose of the property and realize on the collateral which it had been forced to take in.

"The statutes of Missouri expressly forbid that the money of a bank should be invested directly or indirectly in any trade or commerce.

"This statute is merely declaratory of the common law. The statute provides 'that banks may sell all kinds of property which comes into its possession as collateral security for loans,' etc. This implies that a sale should be made within a reasonable time. The bank purchased all the stock of the Consumers Coal Company in 1889. Certainly it should have disposed of the property and wound up its business, if it was necessary to conduct the business at all, long prior to 1893. The referee thinks that the defendant Rottman, owing to his gross neglect of duty as president of the bank, is liable for all money which the bank invested in this business between the second day of April, 1893, and the sixteenth day of April, 1896, when it wound up the business of the coal company, thus putting an end to the loss. The indebtedness of the coal company on April 16, 1896, was $159,611.85; on April 2, 1893, it was $106,944.81. There was an increase, therefore, in the indebtedness between those dates of $52,667.04.

"The referee is of the opinion that J. H. Rottman is liable for this increase, to-wit, the sum of $52,667.04. He is also of the opinion that the pleadings are sufficient to support a judgment in his view that the investment of the money lost in this coal business was illegal. The money drawn by the coal company took the shape of overdrafts. The pleadings allege that the defendants negligently permitted these overdrafts. The fact that the overdrafts were illegal is consistent with and tends to sustain the allegation that the defendants were negligent in permitting them.

"There is no evidence that there was any negligence of the defendants in reference to the original in-

debtedness of the Nolte & Dolch Fertilizer Company and of Louis Nolte and J. W. Dolch to the bank which was created at the time of the sale by the bank to the company of the plant, or that there was any evidence of negligence of the defendants in failing to collect this indebtedness. The cashier allowed this company to overdraw its account from the beginning. They should not have been permitted to overdraw their account at all, but the overdrafts were afterwards settled by notes which were secured by collateral, with the exception of the overdraft, which existed at the closing of the bank, of $487.52. There is no evidence that these notes were not well secured and good at the time they were taken. The referee is therefore of the opinion that the defendant Rottman is not liable for any of the losses which the bank may have suffered upon the account of Nolte & Dolch Fertilizer Company, except for the overdraft $487.52, for which he is liable.

"The referee is of the opinion that defendant Rottman is liable for the overdraft of $3,566.40, which existed against Schwartz Brothers Commission Company, at the close of the bank, but that he is not liable for the overdrafts of this company, as they were afterwards fully settled by notes as in the case of Nolte & Dolch Fertilizer Company. For the same reasons which are stated in reference to the latter company Rottman should not be held liable for subsequent losses by the bank on these funded overdrafts. The overdraft of $3,566.40 was allowed after Schwartz Brothers Commission Company was in financial straits and should never have been allowed at all by the cashier.

"The referee is of the opinion that defendant Rottman is liable for the amount of the overdrafts existing on account of T. S. Teuscher at the close of the bank, to-wit, $944.20. It occurred after the defalcation transaction, and after Teuscher was in desperate financial straits. It was made by the cashier and should never have been permitted.

"The other indebtedness of T. S. Teuscher to the bank consisted of two accounts.

"For the same reasons stated in reference to the defendant Rottman, the referee is of the opinion that defendants, Klages and Marks, are liable for the the same amounts for which the defendant Rottman is liable."

It is made apparent from the expression of the views of the referee that he bases his conclusion of liability of the defendant Klages, who was one of the directors of the Mullanphy Bank, as well as a member of the discount and examining committee of said corporation, upon the gross negligence and inattention to the duties imposed upon him by reason of his relative position to the bank.

In support of his legal conclusions, the referee cites one of the leading cases upon the subject—Briggs v. Spaulding, 141 U. S. 132—in fact, he expressly states that he was guided in his legal conclusions, as to the liability of defendants, by the principles announced in that case.

We have given the legal conclusions reached by the referee our most careful attention, have considered the authorities cited by learned counsel for appellants and respondent in their able and exhaustive briefs now before us, and we are of the opinion that his conclusions, based upon his finding of the facts, are correct.

This court has plainly indicated its views upon this proposition. In Bank v. Hill, 148 Mo. l. c. 392, BUR-GESS, J., in discussing the conduct of the directors in that case said:

"And while it is not pretended that they misappropriated any of the funds of the bank, or that they were guilty of any fraudulent conduct, they were guilty of gross neglect in leaving the entire management of the business of the bank to the cashier. And it is no excuse for the want of diligence to say that they had no benefit from it, and that their services were gratuitous,

when by the exercise of ordinary care they could have prevented the disastrous consequence which flowed from the want of such care.''

While in that case it will be observed that the court held that the directors were not liable in the suit of the general creditor, during the course of the opinion, the clear announcement of the rule, as applicable to this case, was made. It was there said: ''The directors having been guilty of negligence in the discharge of their duties by reason of which losses were sustained by the bank, they were liable in an action at law to the corporation while a going concern for losses due to such loans, or to the assignee after the assignment, or in equity to the stockholders, in the event of the declination of the assignee to bring suit.''

This case was approved in Utley v. Hill, 155 Mo. l. c. 259. MARSHALL, J., speaking for the court in that case, after pointing out the relation between the creditor and the bank, citing Briggs v. Spaulding, 141 U. S. 132, and Bank v. Hill, supra, said:

''Accordingly, it was held in Bank v. Hill, supra (which was a suit by the creditors of the same bank against these same defendants to recover the deposits lost by the creditors by reason of the negligence of the defendants in managing the affairs of the bank), that there could be no recovery by depositors against directors of a bank because of the negligence of the directors in managing the affairs of the bank; that the directors are liable for negligent performance of duty to the bank, or to its assignee, or to a receiver thereof, but not to the creditors, because of want of privity of contract or duty between them.''

In view of these plain expressions of this court upon the proposition of liability of directors for negligence in the management of the business of the bank, we deem it unnecessary to burden this opinion with a review of all the authorities on this subject; it is sufficient to say that the conclusion reached in this cause is

supported by the overwhelming weight of authority.
[Hun v. Cary, 82 N. Y. 65; Marshall v. Savings Bank,
85 Va. l. c. 684; Morse on Banks and Banking (4 Ed.),
sec. 128; Brinckerhoff v. Bostwick, 88 N. Y. 52; Bank
v. Hill, 148 Mo. 380; Cook on Stock and Stockholders
(2 Ed.), sec. 703; Bank v. Bosseiux, 3 Fed. 817; Wil-
liams v. McKay, 40 N. J. Eq. 189, and the same case
in 46 N. J. Eq. 25.]

It is contended by appellant that there was a fatal
variance between the allegations of the petition and the
proof so far as it refers to the indebtedness of the Con-
sumers Coal Company in this, that the averment relates
to negligence, and the proof, if any, is that of inten-
tional injury. We are unable to give our assent to this
contention. It will be noted, that even after the pur-
chase of all the stock of the coal company a separate
existence of the two corporations continued. The in-
vestment of money by the bank in the coal business was
illegal and the illegality of that investment was accom-
plished through overdrafts, and the negligence com-
plained of is in permitting these overdrafts. The over-
drafts were illegal and it was negligence in the manage-
ment of the bank, with full knowledge of the business
of the coal company, to continue to recognize and honor
them. While the referee finds that the investment of
the bank in the coal business and the carrying on of that
business was illegal, and so far as those acts were con-
cerned, were intentional, yet he does not find that the
injury resulting from such acts was intentional and
willful, but simply the result of negligence.

In other words, the finding, in effect, is that there
was no dishonesty practiced in the transaction with the
coal company; but that in permitting the overdrafts in
view of the surrounding conditions of the coal company
there was, in fact, gross negligence. The referee, in
his conclusions, finds that the pleadings were sufficient
to support a judgment and he says, "That the invest-
ment of the money lost in this coal business was illegal.

The money drawn by the coal company took the shape of overdrafts. The pleadings allege that the defendants negligently permitted these overdrafts. The fact that the overdrafts were illegal is consistent with and tends to sustain the allegation that the defendants were negligently permitting them.''

We are of the opinion that this conclusion was correct, and that there was no variance in the proof and the averment in the petition respecting this subject.

It is unnecessary to pursue this subject further; the conclusions reached by the referee, upon the other accounts involved, were correctly based upon his finding of the facts, and finding no reversible error in the action of the trial court in approving the report of the referee and entering judgment in accordance with the facts found by him, the judgment should be affirmed, and it is so ordered. All concur.