RATERMANN BUILDING & CONTRACTING COMPANY, a Corporation, Appellant, v. MISSOURI PORTLAND CEMENT COMPANY, a Corporation; MISSISSIPPI RIVER SAND & MATERIAL COMPANY, a Corporation; and THEODORE RASSIEUR.—145 S. W. (2d) 422.

Division One, December 11, 1940.

*John L. Gilmore* for appellant.

*Rassieur & Rassieur* for Missouri Portland Cement Company and Theodore Rassieur; *John J. Phelan* for Mississippi River Sand & Material Company.

14

BRADLEY, C.—This is an action to recover $500,000 actual, and $100,000 punitive damages for alleged fraud and deceit. Separate demurrers to the second amended petition were sustained and plaintiff appealed. The petition covers thirty-four pages, but assuming the allegations to be true, the salient facts may be stated as follows: For many years prior to the latter part of 1928, plaintiff was profitably engaged in the building and contracting business in St. Louis and vicinity, and was a creditor, for a large sum, of the Meramec Portland Cement & Material Company, and owned three valuable pieces of real estate in St. Louis and in St. Louis county, which properties had the necessary equipment to carry on the sand and gravel, and the building materials and supplies business. In the latter part of 1928, there were many companies, in St. Louis and vicinity, engaged in the same or similar business, and plaintiff believed that conditions in this industry were in great confusion, and that the industry, as a whole, suffered great waste and loss because of duplication of effort, equipment, etc. Plaintiff, being aware of these conditions, "conceived the idea of arranging for" conferences with other local companies in the industry, "believing that something could be done to eliminate" waste, duplication, etc. Conferences were held at which "plaintiff presented its conception of the situation" to the corporate defendants and to several other companies, and all agreed that something should be done "to remedy the situation," and that the most practical thing to do "would be to consolidate all of the companies into one company."

Defendant, Rassieur, was, at the time and for many years prior, attorney for defendant, Missouri Portland Cement Company, and this company suggested that Rassieur be attorney for all concerned, instead of each company depending upon the advice of its own attorney. Defendant, Missouri Portland Cement Company, represented that Rassieur was possessed of superior knowledge and information respecting "a matter of this character," and plaintiff relied upon this representation, and Rassieur was retained as counsel for all concerned. The real purpose of defendant, Missouri Portland Cement Company, in urging the retaining of Rassieur was, as alleged, to secure counsel favorable to it, and who would assist in carrying out a plan to cheat and defraud plaintiff and others.

In February, 1929, George Ratermann, an officer of plaintiff, and Mr. Besch and Mr. Norcross, officers of the defendant, Missouri Portland Cement Company, called at Rassieur's office and presented and explained to him the agreed upon consolidation plan and asked

for his advice. Rassieur told them that he would go into the matter "and would let them have his definite advice as soon as possible." The corporate defendants "seized upon the situation as an opportunity for their own enrichment and for damage to plaintiff and wilfully, maliciously, wrongfully, and unlawfully conspired, confederated and combined with each other and with the defendant, Rassieur, to create a situation which they could turn and mold to their own advantage and to the damage and detriment of plaintiff." Thereafter, Rassieur informed plaintiff that the consolidation plan was desirable, but that in his experience in the handling of such matters, the consolidation should not be at once consummated for the reason that the customers of the respective companies might believe that such consolidation was to increase prices, and that, in order to avoid such, it would be the wisest policy to form two corporations and to merge them in about six months, and that he had worked out the following plan:

Form two corporations, one the Standard Building Materials Company to consist of the corporate defendants, and the St. Charles Sand and Material Company, and the other, the Central Building Materials Company, to consist of plaintiff and eight other named companies. Rassieur said, according to the petition, that both new companies would have the same amount of cash and working capital, but the Central company would be caused to fail, and the Standard would be aided by all the others to prosper, and that after about six months, the Standard and Central would consolidate. The Standard and the Central were formed and the old companies going to make up the Standard conveyed their respective properties to it, and each, in turn, received stock in the Standard in proportion to the value of the property conveyed, and those companies going to make up the Central conveyed their respective properties to it, and each, in turn, received stock in the Central, in proportion to the value of the property conveyed.

The Standard and Central commenced business, but the plan to prosper the Standard and to destroy the Central was carried out. Rassieur, for various pretended reasons, as alleged, postponed the consolidation of the Standard and Central, and finally announced that the consolidation was illegal and could not and would not be carried out. The Standard was thereupon dissolved, and the defendants fraudulently converted its money and properties to their own use, which money and properties, in part, belonged to plaintiff. Upon learning of the proposed dissolution of the Standard, plaintiff demanded damages and an accounting of the Standard and the defendants. The defendants agreed among themselves that if liability was established against them, or either of them, or against the Standard or any of its assets, they would share such liability in proportion to the amount of their holdings in the Standard.

The source and cause of plaintiff's alleged damages, according to the petition, are: (1) Conveyance of its properties to the Central;

(2) expenditures for appraisal of its properties in order to determine the amount of stock it would receive in Central upon the conveyance of its properties to that company; (3) loss sustained by plaintiff by performing its agreement with Central to stay out of the sand, gravel, and building and materials business; (4) loss sustained by plaintiff in the depreciation resulting to its machinery on account of idleness and nonuser; (5) loss of income from its properties; (6) loss due to disbanding its organization; and (7) loss of income from the Meramec Portland Cement & Material Company, its debtor.

The separate demurrers alleged that the petition stated no cause of action in plaintiff; that several alleged causes of action were improperly united in the petition; and that "the cause of action sued is barred by the five-year Statute of Limitations. The trial court did not specify the ground upon which the demurrers were sustained, but plaintiff states in its brief that "the sole argument advanced by respondents (defendants) in the lower court in support of their demurrers was the alleged insufficiency of the allegations in the petition to state a cause of action," and it is on that ground that defendants here rely.

We can more clearly, we think, rule the questions involved by specifically considering the contentions made by defendant in support of the judgment sustaining the demurrers. In the brief defendants state: (1) "The facts alleged in the petition show no damage sustained by the plaintiff resulting from alleged misrepresentations. The facts alleged show damage suffered by Central Building Materials Company for which that company alone may sue, but not its individual stockholders suing in their own behalf;" (2) that "where the real gravamen of the action is that defendants failed and refused to carry out an agreement to consolidate certain companies, which consolidation would have been in violation of the anti-trust statutes, the plaintiff cannot recover, even though the petition is for fraud and deceit and charges the plaintiff was fraudulently led to believe at the time that such agreement was legal;" and (3) that "fraud cannot be predicated upon a promise to do something in the future. A promise, though made without intention to fulfill, is not a misrepresentation of an existing fact."

To support the demurrers defendants rely principally upon Loomis v. Mo. Pac. Ry. Co. et al., 165 Mo. 469, 65 S. W. 962, and cases therein reviewed, and Dorrah v. Pemiscot County Bank, 213 Mo. App. 541, 256 S. W. 560.

It was held in the Loomis case that plaintiff failed to make a submissible case and his petition was dismissed. The facts of the Loomis case may be stated as follows: Prior to February, 1881, Loomis owned practically all of the 500 shares (par value $100) of the Choctaw Coal & Mining Company, which company was engaged in mining coal in Indian Territory, and had expended large sums of

money for equipment. The defendant railway company, whose main line was near plaintiff's coal lands, sought to acquire control of these lands and plaintiff's coal business and also sought to monopolize the coal business, especially in Indian Territory. In order to accomplish these ends, the railway company employed one Crandall, a defendant, to make a survey of the coal business in Indian Territory and make report thereof. Crandall made the survey and reported, whereupon the railway company, and A. A. Talmage, its general superintendent, James A. Hill, its general freight agent, and Crandall, formed a conspiracy to obtain control and possession of the stock and mining properties of the Choctaw Coal & Mining Company owned by plaintiff, and proposed to plaintiff that the capital stock of his company be increased from $50,000 to $100,000, and that the $50,000 new stock be issued to plaintiff, and that he sell the new stock and $16,000 worth of the old stock to Talmage, Hill, Crandall, and the railway company, and that the three named individuals be elected directors of the Choctaw company. All this was done, but plaintiff was not paid for the stock he transferred.

Thereafter, Talmage, Hill, Crandall, and the railway company, under the law of Illinois, formed the Atoka Coal & Mining Company, a defendant, with a capital stock of $500,000, comprising 5000 shares of the par value of $100 each, and the subscribers to the stock were J. N. Patton, C. M. Hays, Talmage, Hill, L. S. W. Folsom, and Crandall. Patton, Hays, Talmage, Hill, and Folsom took 50 shares each, and Crandall 4750 shares. Crandall's subscription was not for himself, but 2500 shares of his subscription were for the railway company, and the remaining 2250 shares were held by him in trust for the Atoka Company. Talmage, Hill, Crandall, Hays, and Folsom were elected directors of the Atoka company, Talmage president, Hays secretary, and Crandall treasurer. July 1, 1881, Talmage, Hill, and Crandall transferred their $66,000 interest in the Choctaw company to the Atoka company, and received $64,800 worth of the Atoka company stock. The result was that plaintiff was defrauded out of the $66,000 worth of stock of the Choctaw company transferred by him to Talmage, Hill, Crandall, and the railway company.

After this setup got going in 1881, the Choctaw company returned a monthly profit of $5000 up to 1887, and the greater part of these profits were expended by Talmage, Hill, and Crandall, under the direction of the railway company, in developing the mines of the Atoka company, and the profits not so spent were used by the three named individuals and the railway company. The Atoka company paid to itself, Hill, and the railway company, $220,500 derived from the profits of the Choctaw company by the Atoka company. In April, 1887, the Choctaw company's mining properties were abandoned. "All these acts and things were done by the railway company, Talmage, Hill and Crandall, without the knowledge of plaintiff,

and so secretly as not to put him on notice thereof. . . . He was kept in ignorance as to the wrongful and fraudulent acts of the parties aforesaid until about January 4, 1890, when disclosures were made by Crandall and Hill in a certain suit instituted by said Hill against the Atoka Coal & Mining Company in the Circuit Court of the City of St. Louis, Missouri, to recover a dividend claimed to have accrued on a number of shares of the stock of the Atoka company held by him.''

Loomis was unable to get the Choctaw company to file suit ''to take any action whatever.''

In ruling that plaintiff, in the Loomis case, could not recover, the court said (165 Mo. l. c. 487, 65 S. W. 963):

''At the threshold of this case, we are met with the objection that the plaintiff cannot maintain this action, as he endeavors to do, in his individual capacity. It is obvious that plaintiff is seeking to work out his alleged equities solely through his ownership of stock in the Choctaw Coal & Mining Company and the alleged wrongful and fraudulent appropriation of the assets of that corporation by the Atoka Coal & Mining Company. Whatever rights he has in the premises are predicated upon his ownership of stock in the Choctaw company. It is plain that if the Atoka company and its codefendants were guilty of the fraudulent misappropriation and conversion of the Choctaw company's properties, which he asserts, the injury and loss was to the Choctaw company and all of its stockholders and not to plaintiff only, and in such cases the general rule unquestionably is that the injured corporation must sue in its own name and an individual stockholder cannot maintain the action,'' citing Slattery v. Trans. Co., 91 Mo. 217, 4 S. W. 79; Hannerty v. Standard Theater Co. et al., 109 Mo. 297, 19 S. W. 82; Meyer v. Bristol Hotel Co., 163 Mo. 59, 63 S. W. 96; Hawes v. Oakland, 104 U. S. 450; Thompson's Com. on Corps., secs. 4476-77.

The Dorrah case, supra, was a suit by a stockholder in the Pemiscot County Bank, against the bank and its directors. Plaintiff owned 15 shares of the stock and alleged that through the negligence of the defendants the bank became insolvent and his stock valueless. Plaintiff recovered below and appeal followed. In reversing the judgment in favor of plaintiff the court used this language (256 S. W. l. c. 562):

''We take the doctrine to be undebatable that where directors of a bank have wrongfully or negligently conducted themselves with reference to the affairs of the bank, and the bank has thereby suffered loss, the corporation is vested with a right of action against the directors, or so many of them as caused the loss, for the amount lost by reason of such misconduct or negligence. It may be further agreed that in the event the corporation, after request, refuses to bring such suit, then a stockholder may enforce such cause of action accruing to the corporation, and indeed such suit may be brought by

a single stockholder for the corporation in the event the other stockholders refuse to participate in such proceeding. There is authority for the proposition that where demand to sue would be futile or useless, or where the persons sought to be sued are in control of the bank, no request to sue is necessary. In case a stockholder' suit is brought, however, it devolves upon such stockholder to allege and prove the facts which would authorize him in his own name to prosecute the cause of action which vested in the corporation and for which the stockholder interposes the suit. [Stone v. Rottmann, 183 Mo. 552, l. c. 571, 82 S. W. 76; Vogeler v. Punch, 205 Mo. 558, 103 S. W. 1001; Bank v. Hill, 148 Mo. 380, 49 S. W. 1012, 71 Am. St. Rep. 615.] And it must be kept in mind that although the stockholder brings the suit, such cause of action undergoes no metamorphosis by reason of the stockholder instituting same rather than the corporation; it remains the same whether brought by the corporation or by a stockholder for the corporation.''

Many cases are reviewed and quoted in the Dorrah case, among which is Porter v. Sabin, 149 U. S. 473, 13 Sup. Ct. 1008, 37 L. Ed. 815, where it is said (149 U. S. l. c. 478): ''The right to maintain a suit against the officers of a corporation for fraudulent misappropriation of its property is a right of the corporation; and it is only when the corporation will not bring the suit, that it can be brought by one or more stockholders in behalf of all.''

It will not be necessary to consider other contentions made by defendants in support of the demurrers. As we see it, plaintiff cannot maintain this cause. The judgment sustaining the demurrers should, therefore, be affirmed and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.