## McGINNIS v. CORPORATION FUNDING & FINANCE CO.

(District Court, M. D. Pennsylvania. October 19, 1925.)

No. 137.

**1. Limitation of actions ⊜➡110—Appointment of receiver for insolvent corporation tolled statute of limitations, so that claims against corporation were not barred by statutory age limit.**

Appointment of receiver for insolvent corporation *held* to toll statute of limitations so that claims against corporation were not barred by statutory age limit, where insolvency was alleged in application for appointment of receiver, and it was apparent that hopeless insolvency was a fact, and no business of corporation was at any time undertaken by receiver, except marshaling of scattered assets remaining from corporation for distribution among those entitled thereto.

**2. Corporations ⊜➡565(2)—Insurance company held entitled to share in distribution of assets of insolvent corporation as creditor in amount of deposit paid by corporation to state to enable insurance company to do business.**

Where corporation acting as sales agent for stock of insurance company failed to pay proceeds of such stock over to such company, but deposited with state insurance department the sum of $5,000, necessary to enable such company to do business, and thereafter became insolvent, insurance company *held* entitled to share in distribution of corporation's assets as a creditor in sum of such deposit, where corporation had more than sufficient funds to make such deposit when it was paid, and it did not appear that such deposit was paid from funds other than those belonging to insurance company.

**3. Judgment ⊜➡736—That deposit paid by insolvent corporation, selling insurance company's stock, was included in its receiver's account, held not res adjudicata of insurance company's claim thereto.**

Where corporation acting as sales agent for stock of insurance company failed to pay proceeds thereof over to such company, but deposited sum of $5,000 with the state to enable insurance company to do business and thereafter became insolvent, that amount of deposit was included in corporation receiver's account *held* not res adjudicata of insurance company's claim thereto, where money was still in hands of the receiver, and account did not adjudicate fact as to who was entitled to such deposit.

**4. Corporations ⊜➡565(1)—Insurance company was creditor of insolvent corporation, where proceeds of its stock sold by corporation were never paid to it.**

Where corporation acting as sales agent for stock of insurance company failed to pay proceeds thereof over to such company, and thereafter became insolvent, insurance company *held* to be a creditor of corporation and entitled to participate in distribution of its assets in amount of proceeds of stock sold, where such proceeds were regarded by officers of corporation as an unquestioned liability, and no partnership relation being created because business of a mutual insurance company was to be turned over by corporation to insurance company.

**5. Corporations ⊜➡310(1)—Corporation directors personally liable for losses resulting from any breach of duty.**

Directors of corporation are personally liable for losses resulting from any breach of duty.

**6. Corporations ⊜➡310(4)—Directors personally liable to stockholders, if using capital stock of company for payment of dividends.**

Directors may not use capital stock of company for payment of dividends, and, if they do so, they are personally liable to stockholders.

**7. Corporations ⊜➡566(4)—Corporation directors held not entitled to participate in assets of insolvent corporation, where they were guilty of legal fraud.**

Claims of directors of corporation of insolvent corporation *held* not entitled to participate in distribution of assets until all other claims were paid and discharged, where fraud and gross mismanagement were practiced in administration of affairs of corporation in which such directors officiated, and, if they did not have actual guilty knowledge thereof, they were guilty of legal fraud.

**8. Receivers ⊜➡163—Interest will be allowed on claims against insolvent corporation only until date of appointment of receiver.**

Interest will be allowed on claims against insolvent corporation only until date of appointment of receiver, where he was appointed on allegation of insolvency, and postponement of distribution of assets was fault of machinery of the law.

**9. Receivers ⊜➡163—Debts of insolvent do not bear interest after appointment of receiver or assignee in insolvency, where postponement of distribution is fault of the law.**

Where postponement of distribution of assets of insolvent is fault of machinery of the law, debts are in status quo, and do not bear

interest after appointment of receiver or assignee in insolvency.

In Equity. Suit by John C. McGinnis against the Corporation Funding & Finance Company. On exceptions to the report of the special master, distributing the funds in hands of the receiver of defendant. Report modified.

Max L. Mitchell, of Williamsport, Pa., and Harvey H. Steckel, of Aubrey, Steckel & Senger, of Allentown, Pa., for Lancaster Trust Co., Jersey Shore Trust Co., George B. Mauser, and others.

John A. Coyle and K. L. Shirk, both of Lancaster, Pa., for Lititz Nat. Bank.

J. R. Dickinson, of Reading, Pa., and J. P. Carpenter, of Sunbury, Pa., for receiver of Reading Life Ins. Co. and the Reading Life Ins. Co. stockholders.

H. B. Lutz, of Lancaster, Pa., for the stockholders of the Corporation Funding & Finance Co.

J. B. McGurl, of Pottsville, Pa., for the estate of W. L. Marquardt.

R. A. Reick, of Frackville, Pa., and F. A. Witmer, of Sunbury, Pa., for the receiver of Corporation Funding & Finance Co.

JOHNSON, District Judge. The matters at issue arise from exceptions to the report of the special master, distributing the funds in the hands of the receiver of the Corporation Funding & Finance Company. From the evidence reported, it appears that the Corporation Funding & Finance Company is a Delaware corporation, chartered on the 23d day of October, 1908, with a capital of $250,000 to "purchase and otherwise acquire, hold, sell, assign, transfer, * * * business concerns and undertakings, mortgages, shares, stocks, policies, * * * to acquire good will, rights, and property," as expressed in its charter.

The Reading Mutual Life Insurance Company, also a Delaware corporation, chartered simultaneously with the aforementioned corporation, on October 23, 1908, promoted and developed a mutual insurance business, which business it was intended should be taken over by a stock insurance company, and, for this purpose, the Reading Life Insurance Company was chartered under the laws of the state of Delaware, with a capital of $300,000, on the 15th day of April, 1909. The stock company, the Reading Life Insurance Company, could, however, not function under its Delaware charter as an insurance company until $100,000 of its capital stock was paid in. This company was registered and intended to do business in Pennsylvania, but it was not licensed to do business by the insurance department of the latter state, because it had not qualified for this purpose under its laws, not having paid its capital stock into the treasury.

On October 29, 1908, in anticipation of the organization of the Reading Life Company, the Corporation Funding & Finance Company passed the following resolution:

"That the Corporation Funding & Finance Company make a contract with the Reading Life Insurance Company to take the entire output of stock of said company and agree to pay the Reading Life Insurance Company for the stock when sold, as follows: $10 per share for the first 10,000 shares; $12.50 for the next 10,000 shares; $15 per share for the remainder. And that the money for the sale of said stock be turned over to the Reading Life Insurance Company once a month."

Thereafter, the stock of the Reading Life was sold by the Corporation Funding & Finance Company, or through its authorized representatives, in excess of the price agreed to be paid to the Reading Life of more than $100,000, and the proceeds paid into the treasury of the Corporation Funding & Finance Company; the stock certificates having been issued as paid directly to the purchasers by the officers of the Reading Life. None of the proceeds of this stock was ever paid into the treasury of the Reading Life in pursuance of the above resolution, but $5,000 thereof was deposited with the state of Delaware in compliance with its laws authorizing the Reading Life to engage in an insurance business. This sum of $5,000 was returned by the insurance department of the state of Delaware to the receiver of the Reading Life, who was also the receiver of the Corporation Funding & Finance Company, and he erroneously charged himself with this item in his receiver's account of the latter corporation. Although the proceeds of the Reading Life stock sales, or any part thereof, were never paid into the treasury of this company, the Corporation Funding & Finance Company charged itself upon its books with an item of $166,670 as an obligation due the Reading Life for stock subscriptions. The proceeds of these stock sales were paid into the treasury and commingled with the funds of the Corporation Funding & Finance Company, by its directors, and a considerable portion thereof was disbursed to these same directors and stockholders of the Corporation Funding & Finance Company, as salaries and dividends, in face of the fact that the Corporation Funding & Finance

Company was helplessly insolvent and had paid into its treasury funds of the stockholders of the Reading Life Insurance Company, carried upon its books and in its reports as an obligation in the nature of a trust fund due the latter corporation.

The assets of the Reading Life, paid to the sales agent of its stock, the Corporation Funding & Finance Company, by the purchasers of that stock, was used wholly for the benefit of the Corporation Funding & Finance Company, and the Reading Mutual Life Insurance Company, and the business which was promoted through the Reading Mutual was finally sold and paid into the treasury of the Corporation Funding & Finance Company.

By written contract dated January 1, 1909, the Corporation Company became the agent of the Reading Mutual for a period of 20 years, to solicit and exploit its business, receiving as compensation for the services rendered the first year 80 per centum of all premiums on insurance written and issued, 15 per centum the second year, and 7½ per centum the next 18 years. On April 1, 1909, a new agreement was executed whereby the contract of January 1, 1909, was changed, inter alia, by fixing the commissions at 80, 30, and 22½ per centum for the respective terms, and that a stock company to be called the Reading Life Insurance Company should be formed, and all contracts and policies of the Reading Mutual should be transferred to the Corporation Company.

At the first meeting of the board of directors of the Reading Life, after its incorporation, the following resolution was passed:

"Upon motion duly made and seconded, it was resolved that the contract existing between the Corporation Funding & Finance Company and the Reading Mutual Life Insurance Company, dated 1st of January, 1909, and 1st of April, 1909, be and the same each are hereby, respectively, assumed and adopted by this company in all respects and conditions, to take effect as soon as the company commences active operation."

Although some of the statements showed an indebtedness of $166,670 to the Reading Life for stock sales, the sales books disclose the sale of only 13,461 shares, which, under the resolution of October 29, 1908, would have made the Corporation Company liable to the Reading Company in the aggregate sum of $143,262.50, being for 10,000 shares at $10 and 3,461 shares at $12.50.

The directorate of the three companies was interlocking, and with one or two exceptions was the same in each company. Approxi-

mately $744,000 passed into the treasury of the Corporation Company, and only $32,-324.80 of this amount was in the treasury when the receiver was appointed. The purchasers of the stock of the Reading Life were led to believe that their investment would function a stock insurance company, whereas no part of their contribution found its way into the treasury of the Reading Life, they had no voice in its disposition and their company received no benefits excepting the $5,000 deposited with the insurance department of the state of Delaware.

Two of the directors were convicted in the Berks county court, Pa., of a conspiracy to defraud; the case was appealed to the Superior Court of Pennsylvania, and is reported in 64 Pa. Super. Ct. 395 to 427.

On June 5, 1912, John C. McGinnis was appointed receiver of the Corporation Funding & Finance Company (upon a bill in equity alleging insolvency), by the United States District Court for the Middle District of Pennsylvania, and he was also appointed receiver of the Reading Life Insurance Company, in the same court on June 17, 1912. From his administration of the former receivership, the funds for distribution arise.

A special master was appointed to hear the testimony and make recommendations as to the distribution of the funds in the hands of the receiver.

At the hearing before the master, a number of the directors presented claims; the receiver of the Reading Life Insurance Company presented a claim for the amount due on account of the stock sales and the $5,000 deposited with the insurance department of the state of Delaware. Stockholders of the Corporation Funding & Finance Company claimed the balance of the fund after satisfaction of certain admitted debts, contending that all claims not reduced to judgment were barred by the Pennsylvania statute of limitations.

The Corporation Funding & Finance Company having been organized October 23, 1908, all of its debts were created within 6 years prior to the appointment of a receiver.

[1]. If the statute of limitations was not tolled by the appointment of a receiver, only a few of the claims presented could survive to participate in this distribution, as they would long since have been barred by the statutory age limit, more than 6 years having elapsed from the date of the receiver's control to the time of their presentation. The master concluded that none of the claims are barred by reason of the lapse of time, and

in this conclusion we concur. While it is true under the laws of Pennsylvania the appointment of a receiver does not always toll the statute, in the present case insolvency was alleged in the application for the appointment of a receiver, and it was then, as now, very apparent that hopeless insolvency was a fact; no business of the corporation was at any time undertaken by the receiver, except the marshaling of the scattered assets remaining from the collapsed wreck, for the purpose of distribution amongst those entitled thereto. Under such a state, it would have been useless to institute vexatious suits and cause the expenditure of large sums in defense. The litigant would not have in any way benefited, as he could not have obtained a preference, as stated in Cowan v. Plate Glass Co., 184 Pa. 1, 38 A. 1075:

"Where a judgment has been recovered against a corporation after the appointment of a receiver, it does not give the creditor who has obtained it a preference over other creditors in the distribution of corporate assets. * * * In the case before the court, the right of appellants, as of all creditors, must be determined as of the date the insolvency was adjudged."

[2, 3] First, is the Reading Life Insurance Company entitled to share in the distribution as a creditor in the sum of $5,000, the deposit paid to the insurance department of the state of Delaware, and afterward returned to and recovered by the receiver of the Reading Life, and by him erroneously included in his account as receiver of the Corporation Company? This question was resolved affirmatively by the master, and we agree with his conclusion. Unquestionably the officers and directors of the Corporation Company or the Reading Life had more than sufficient funds to make this deposit at the time it was paid to the Delaware authorities, and the presumption is that the payment was made from the funds of the Reading Life, at least there is no evidence to the contrary, and to say that some other funds or assets were used would be an unwarranted and arbitrary conclusion, not based upon the facts, nor the evidence in the case. It is only reasonable to suppose that the officers, at least in this respect, would not exceed their authority by appropriating the funds of some other institutions to effect this payment when they had sufficient funds of the debtor at hand to use for this purpose. If not, the burden of proof is upon him who makes denial, and the burden has not been attempted. This amount, less collection costs, which is

an expenditure of the Reading Life, as found by the master, should be paid as a preferred claim. There is no merit in the argument that this is res adjudicata, because it is included in the Corporation Company's receiver's account. This court will not lend its aid to deprive one of its property through the error of its officers. Besides, the money is still in the hands of the receiver, and the account does not adjudicate the fact as to who is entitled to this item charged.

Second, is the Reading Life a creditor by reason of proceeds of its stock sold by the Corporation Company pursuant to the latter's resolution of October 29, 1908, wherein it was determined that the Corporation Company should act as sales agent for this stock and pay the proceeds at the fixed price, monthly, to the Reading Life? This claim is resisted principally for two alleged reasons. It is argued first that this sales agreement or resolution was never accepted by the Reading Life since it was passed by the directors of the Corporation Company, before the incorporation of the Reading Life, and the minutes of the latter made no such showing, and that no sales contract existed except by implication. It is argued by the creditor directors that the actions of the Corporation Company and the Reading Companies were inconsistent with the theory of a contract to pay over monthly the accruing stock income by the former to the latter company. But that is the grievance and the complaint here, and said to be the very essence of the wrong and the basis, it is argued, upon which a scheme of fraud was predicated, that if this money had been paid into the treasury of the Reading Company, as it should have been, a sum approaching $200,000 would be resting in its treasury, and the stockholders would be in a position to organize and qualify their company to engage in the business intended by its incorporation. In this argument the fact is overlooked that it was the directors, who had this business in charge, who were responsible for the failure to make these payments, who actually constituted themselves the companies, against whom this dereliction is charged. It was their intention not to pay; to do so would have thwarted their purpose. It is admitted by all interests that the Reading stock was sold by the Corporation Company and all the proceeds found their way into the treasury of the latter company; it is indeed also earnestly contended and admitted that the Reading Life Insurance Company was organized for the purpose of taking ov-

er the insurance business of the Reading Mutual Life Insurance Company and functioning as a stock company.

Conceding, for the purpose of arriving at a solution, a contractual relation of these two corporations by implication, what would the court determine this implied contract to be? The directors of the Corporation Company would have us follow the lines of least resistance, and with them, spend it for officers' salaries, dividends, offices, furniture, agents' salaries, expenses, mismanagement, and general waste, in approval of what was actually done, and for which some of their number paid the penalty by service in a penal institution, and determine that the Reading Company, in the interest of its stockholders, who furnished this money, should be deprived of its use of any voice in its disposition or control because the directors of the Reading Life, being the same as those of the Corporation Company, carefully avoided or neglected taking any action accepting the resolution or fixing the terms of payment of the proceeds or their disposition in any manner; that none of this money should go into the treasury, custody, or control of the Reading Life. This would be in effect a judgment of the court that the stock proceeds of the Reading Life should be confiscated. This could not have been the true object and intent of the officers and directors at the time of the organization and sale, for it is conceded that this stock company was intended to function. But how it could function when its capital was dissipated, without one cent in the treasury, has not been explained. Under the laws of both Delaware and Pennsylvania, a certain amount of the capital stock was required to be paid into the treasury of the Reading Life, $100,000 and $300,000, respectively, before it could attempt to do business, and this could not be accomplished by withholding the proceeds from the treasury of its legal, rightful owner, under whatever pretext or excuse. No action by the Corporation Company directors or the Reading Company is disclosed, tending to authorize the expenditure of this money in any other manner than paying it into the treasury of its owner, and such action, if attempted, would have been ultra vires, a fraud upon the stockholders, illegal and void.

The logical, legal implication is that the directors intended to sell the stock in accordance with their declarations as twice reiterated by the several resolutions, by paying the Reading Company at the rate of $10 for the first 10,000 shares, $12.50 for the next

10,000 shares, and $15 for the remainder, payable monthly, as the stock was sold, and in this manner prepare the stock company to function in conformity with the admitted purposes of its organization, and in compliance with the laws of its creator and of its domicile. This implication is further supported by the fact that the Corporation Company carried an item of liability in the sum of $172,673.67, which, as testified by the secretary, was "based largely on amounts due the Reading Life Insurance Company on stock subscription"; and again, "a large portion of that is the amount due the Reading Life Insurance Company on account of moneys received for the sale of that stock." The receiver also, in his account, listed the capital stock liability of the Reading Life as $127,950, which the secretary testifies was more at that time. The books show such liability of the Corporation Company, and that it actually received in cash from sales of the Reading Life stock, including premiums and deducting unpaid installments, the sum of $234,710.75; the balance due the Reading Life being listed at $166,670. These stock proceeds were apparently regarded by the officers and directors as an unquestioned liability, save that the liability was never discharged by payment.

Again, it is contended that a partnership business was being conducted by the three companies, but apparently the Reading Life was not let into the activities of this mythical creature, but had to be content with reviewing its operations from the outside, like the boy viewing the game through a knot hole. Its assets were subjugated, appropriated, and confiscated without its consent, nor was it informed or consulted, nor even permitted to see any of its coin. No benefit of any kind or nature ever accrued to this company. But it is argued by counsel that the business of one of the companies, the Reading Mutual Insurance Company, was to be turned over to the Reading Life, and that the former's business was promoted for this purpose, and therefore, by reason of this expectancy, it was a member of the partnership. This alleged partnership, of course, must be a creation by implication, but a conclusion by implication must necessarily be based upon and supported by facts, and we are unable to find the facts upon which such an implication is based. All the facts tend to support the opposite conclusion. In truth, a partnership never seemed to have been entertained by the officers and directors during the active operations of the Corporation Company; only in the present exigen-

cies have these directors, who are presenting claims, urged the idea of a partnership, and it is the method by which it is sought to preclude the Reading Life from sharing as a creditor in the funds which its stockholders provided.

The only thread of hope of the Reading Company at any time to join in a partnership participation was the idea of finally taking over the Reading Mutual Insurance business, but this participation was bound to remain only an idea, a dream, and a speculation, because, the longer the idea continued, the less chance remained to put it into execution; without funds it could not engage in business, and the more capital stock it provided, the less funds remained to establish a business; it was constantly being removed farther from the possibility of carrying out the admitted purposes of its creation.

The undisputed evidence is that the Reading Life did no business but to furnish money through its stock sales to the Corporation Company, a fixed amount of which was to be paid monthly into the Reading treasury; that none of this money was paid into the latter's treasury, but was retained by the former and spent for its own purposes and for the benefit of the Reading Mutual Company, which latter company was finally sold by the Corporation Company, and the sales proceeds retained by the Corporation Company; that much of the funds derived from the sale of Reading Life stock and the other business transactions was paid out in dividends to the stockholders of the Corporation Company, salaries to its officers and directors, office rents, sales agents' salaries, and otherwise dissipated through like devices; that the Reading Life was regarded a creditor by the officers and directors of the Corporation Company, as shown by its account books and reports; that the Reading Life Insurance Company was organized as a stock company to take over the insurance contracts of the Reading Mutual Life Insurance Company when it qualified to do business; that to qualify $300,000 capital stock was required to be paid into the treasury; that, although at least $143,262.50 of stock belonged to the Reading Life under the sales contract as defined by the resolution of the Corporation Company, subject to which it agreed to sell the Reading stock, none of these funds were paid into the treasury, excepting the sum of $5,000 deposited with the Delaware insurance department and $680 costs; and that there was no attempt made by the officers and directors to qualify the Reading Life to engage in the insurance business, but the funds intended to be used for this purpose were diverted to the use of the Corporation Company, for its own benefit and its creature, the Reading Mutual Insurance Company. The partnership skeleton has no legal, moral, or ethical basis. No official action was at any time undertaken to authorize such a procedure, the minutes do not reveal any such action, nor has any oral testimony been produced in its support. If such action had been attempted, it goes without saying that it would be illegal and void, as not within the scope of the directors' authority, ultra vires.

[4] We cannot resist the conclusion that, as a matter of fact and under the law, the Reading Life Company is a creditor of the Corporation Company, and as such is entitled to participate in the distribution of the sum of $143,262.50, less $5,680, or $137,582.50, and we so find.

Whether the directors of the Corporation Funding & Finance Company should participate in this distribution as creditors is one of the important questions raised by the exceptions. Of the fourteen claims appearing in the special master's list of recognized creditors, seven were former directors of the company. One of these claims is by the estate of W. L. Marquardt, deceased, for salary and dividends returned to the receiver. This money was paid to the receiver by W. L. Marquardt during his lifetime, and the text of the receipt is as follows:

"The receipt above offered read in evidence as follows:

"'$1,434.54. Pottsville, Pa., August 27, 1914.

"'Received from Norman H. Rich and Clara Marquardt, administrators of William L. Marquardt, deceased, the sum of $1,434.54, being the amount of money which William L. Marquardt is alleged to have received unlawfully as director's salary and as dividends from the companies of which I am receiver, this money only to be used in payment of the legal liabilities of the companies of which I am receiver, and of the expenses incident to the receivership. Should there be any balance after such payments, I will petition the proper court for an order to permit me to refund the same. I also agree that as receiver I will not bring any civil action against the estate of the said William L. Marquardt, deceased, for any of his acts in connection with the corporations of which I am the receiver.

"'Corporation Funding & Finance Company, John C. McGinnis, Receiver.'"

Counsel for the Marquardt estate in his brief states that:

"We make no claim for the Marquardt estate until all of the claims of creditors, including the stockholders of the Reading Life Insurance Company, properly proved and allowed have been satisfied. In other words, if said claims exhaust the funds for distribution, we have nothing to receive."

This is a correct exposition of the legal status of the Marquardt claim, and, as the funds for distribution are insufficient to pay the priority claims, it is not entitled to participate in the distribution. The special master was clearly in error in allowing this claim.

The other director's claims objected to are the following: George B. Mauser, trustee (for codirectors), $6,955; George B. Mauser, $11,298.92; J. W. Lovegood, $1,799.78; George Gessel, $2,344.25; George M. Gamble, $505; E. S. Snyder, $4,852.59; R. J. Dunbar, $500.

The objections to these claims, summarized, are that, having been officers and directors of the three companies, the Reading Life Insurance Company, the Corporation Funding & Finance Company, and the Reading Mutual Life Insurance Company, they participated in diverting the funds of the Reading Life; they failed to protect the funds in their control, which was their duty; they participated in declaring dividends to themselves and the stockholders of the Corporation Company when there were no profits, when that company was in fact insolvent, and used a portion of the capital stock income of the Reading Life for this purpose, and voted to themselves excessive salaries and bonus stock out of the same resources; they were derelict in their duties, because they did not safeguard the funds over which they were the custodians in trust. The special master in his report summarizes the law defining the duties and responsibilities of corporate directors in the following language:

"The duties, liabilities and responsibilities of directors are brought to us from text-books in great numbers and from countless citations of the state and federal reports. From these we learn that directors of a corporation occupy a fiduciary relation toward the shareholders and are treated by the courts of equity as trustees for them. Uberrime fides must ever be their watchword; the interest and welfare of the corporation must rise paramount to any self interest. Their private interests must be subordinated to their official relations with the company, which they represent. That it is the duty of directors to acquaint themselves with the affairs of the company so far as it is pos-sible to do so, to learn of its methods, to be diligent to know of its condition in so far as they are capable of doing. They are regarded under the law as quasi trustees or mandatories of the company and liable as such for breach of duty with respect to the application of it."

A comprehensive exposition of the law is contained in Trustees' Mutual Building Fund, etc., v. Bosseiux et al. (D. C.) 3 F. 827, as follows:

"From this decision it appears that directors are liable for: First, fraud or embezzlement committed by themselves; second, will-ful misconduct or breach of trust committed for their own benefit and not for the benefit of the stockholders; third, acts ultra vires —that is to say, acts beyond the chartered powers of the corporations which they manage, and beyond the general powers conferred by law upon corporations; and, fourth, gross inattention and negligence, allowing fraud or misconduct on the part of agents, officers, or codirectors, which could have been prevented if they had given ordinary care and attention to their duties."

There can be no doubt that there were fraud and gross mismanagement practiced in the administration of the affairs of the companies in which these directors officiated. The master found:

"That there was a misapplication of the funds of this company in payment of exorbitant salaries to some of its officers, lavish expenditures were made for services in procuring stock subscriptions, and improper disbursements of capital in payment of dividends to stockholders, when there was no actual profits to the company, is clearly established by the evidence. That some of the directors and officers were guilty of fraud is shown by prosecutions above referred to in the criminal courts, wherein some were convicted of conspiracy, and the penalty of the law imposed upon them is fully apparent."

These facts are not seriously denied, and there was an abundance of evidence to justify this finding, but the master proceeds to excuse these creditor directors in the following language:

"But because there are some black sheep in a flock does not necessarily make the whole flock black. Corporations are artificial persons, created and devised for purposes of society and government. But the directorate of a corporation is comprised of individuals. It is managed and directed by natural persons and not by machinery. These individuals or natural persons are subject

to human imperfections"—and permits them and the Marquardt estate to share in the distribution.

It becomes necessary, therefore, to examine the facts to determine whether these directors have violated any of the sacred duties of the trust which they took upon themselves to perform. Were they innocent victims of human imperfections, and led into error by an excusable ignorance of the activities of their associates in the administration of the corporate affairs, or did they know, or should they have known what was being enacted in that seclusive inner circle of this coterie of directors and officers?

Of the directors who have presented claims for payment, Lovegood served as a director of the Reading Mutual Life Insurance Company and the Corporation Company until January, 1912, and practically all the time as a member of the executive board or committee of both companies. He was also a director of the Reading Life Insurance Company during the years 1910 and 1912, and was vice president of the Reading Mutual for 1911, and was chairman of the finance committee of the three companies and their secretary and treasurer in 1912, but resigned the office of treasurer of the Corporation Company and of secretary and treasurer of the Reading Company on March 25, 1912.

Snyder was elected a director of the Corporation Company and the Reading Mutual on October 8, 1909; he was re-elected director of both companies January 20, 1910, and made a member of their finance committee. At the same time he was elected a member of the board of directors of the Reading Life. He held the same offices in 1911, having been elected January 19, 1911. He was president of the Corporation Company in 1911, and sent out pamphlets containing admittedly false financial statements. On January 18, 1912, he was re-elected director of the three companies, and president of the Mutual Life and the Reading Life.

Mauser was elected a director of the Reading Mutual Company and the Corporation Company, April 13, 1911, and re-elected January 18, 1912.

Gamble was elected a director of the Corporation Company and the Reading Mutual, March 12, 1909, and made a member of the finance committee of both companies, and was a director in the three companies for the three successive years, 1910, 1911, and 1912.

R. J. Dunbar was elected as a director January 20, 1910, to serve for the year 1911.

On August 11, 1911, the board of directors authorized the issuance of notes in the sum of $30,000 for discount at such banks as arrangements could be made with, and the pawning as collateral security for the same a certificate of deposit in the sum of more than $33,000. Lovegood, in his testimony, excused this transaction because the company was "hard up" on account of the coal strike. Nevertheless, at or about the time of this meeting they declared a stock dividend of 3 per centum. In this year a cash dividend in the sum of $12,811.52, and a stock dividend of $5,529.63, or an aggregate of $18,341.15 in dividends, was declared and paid. In all, six dividends were declared, five of which were paid. Besides the 1911 dividends, dividends were declared March 10, 1910, and a dividend of 3 per centum was declared by the board of directors at its meeting of January 18, 1912, but the last dividend was not paid. It appears that there were two meetings—one for the election of directors, and one at which the dividend was declared. None of the newly elected directors, seven in number, were present when the dividend was declared, which may account for the fact that it was not paid.

The 5 per centum cash and 10 per centum stock dividend in 1910 was upon motion of Lovegood, a 5 per centum cash dividend of the same year was upon the second of E. S. Snyder, and a 3 per centum cash and 3 per centum stock dividend, in 1911 was moved by Snyder and seconded by Mauser. All these dividend motions were carried unanimously. The executive committee, on motion of E. S. Snyder, recommended the 5 per centum cash and 3 per centum stock dividend of 1910; this being the dividend that was authorized on Lovegood's motion. The directors' salaries paid were at the rate of $25 per month.

The stock sales agents received a 25 per cent. commission, in the aggregate, $162,371.89; one of these having been authorized by the motion of Lovegood.

The schedule of salaries included a graduated president's salary of $3,000, $5,000, and $6,000 for the first, second, and third years, respectively, and vice president's salary of $3,000, $4,000, and $5,000, respectively, for the same years; each director's salary was to be $300 per annum, and each member of the executive committee was to receive $5 for each meeting and expenses to and from the meeting.

A study of the audit of the Corporation Company for the year 1909 is interesting. It shows assets in the sum of $172,070.10, against which are charged as liabilities, inter alia, subscriptions of Reading Life In-

surance Company stock, $141,580, and director's and agents' accounts payable $6,210.-10. Under the heading "Profit and Loss," it shows officers' and directors' salaries, $12,-703; total salary expenditure of $32,180.95; commissions, $35,561.31; and a total expense account of $85,758.92. It is especially interesting in that it shows that the premiums for stock was $77,085. Of this total income, excepting $24,280, all was derived from the sale of Reading Life stock, and the purchasers of this stock must have therefore paid practically double its par of $10, although the company was not functioning, nor was there any possible prospect that it ever would function. This was manifest after the company's first audit; nevertheless, the directors continued to foist this worthless stock upon the public at extortionate prices. Under these conditions they sold stock of the Reading Life for an aggregate sum of $234,710.75, including premiums, which was paid into the treasury of the Corporation Company and by it disbursed. Thus, the purchasers of Reading Life stock contributed this enormous sum to the directors of the Corporation Company, which they misappropriated and dissipated, without the consent or knowledge of the stockholders of the Reading Life, and without any corporate action of the Corporation Company board of directors or stockholders authorizing such disposition of these funds.

These directors now contend that the convicted men were the "black sheep" in the flock of directors, and that they have gone through this whirlpool of their iniquity without contamination, pure and untarnished. Yet several of these directors set in the meetings, both of the board and executive meetings, were officers, beneficiaries in salaries and dividends, several on audits of the accounts, and counseled with the alleged malefactors, and never discovered any evidence or suspicion of fraud. They even made motions and did other innocents acts, so they say, which assisted in the promotion of the secret objects attained. Even if their contention of innocence of motive be true, they are not excusable under the law in exercising the obligations of their trust in such a supinely indifferent manner, share in the resultant benefits of the fraud, and stand excused before the law; courts will not lend their assistance to calcimine the sins of the willful omission of those who have shown such a state of inactivity, to say the least, when the public economic interests are jeopardized. At this time, the precautionary state and federal government machinery are exercising great energy attempting to save and protect its unwary citizens from the wiles and machinations of fraudulent schemers, whose duping devices spring up abundantly and easily, like mushrooms over night. The executive, legislative, judicial, and police powers are taxed to the utmost in the attempt to suppress this iniquitous evil, the extortion of money and earnings from the unsuspecting sons of industry by the social parasite who knows no industry. If these directors, therefore, did not intentionally lend their assistance to this wholesale fraud, as they contend, they are nevertheless guilty of legal fraud. Corporate directors are held to an infinitely higher degree of attention, zeal, and fidelity in the administration of their duties than these directors manifested. If they had given ordinary care or attention to these duties, we cannot conceive how they could have conscientiously declared dividends when an expert auditor reported a deficit, at a meeting at which loans were authorized, because the company was "hard up," or have served on the board of directors, the finance committee, or auditing committee, and not have discovered that no profits were accruing, or that the capital funds of another corporation of which they were the trustees was deposited in the treasury of their company and was being illegally used for the purposes of their company, and in paying salaries to the officers and directors, and dividends to the stockholders of the corporation whose destinies they were directing. They were intelligent men of business experience, and, while they were serving these companies in various capacities upon and through the board of directors, at least $137,582.50 of the Reading Life was misappropriated, as also large sums from the Corporation Company. The fraud was so extensive that, if they were not aware of its perpetration, they should have known. They not only failed to raise a voice or hand to stay the maurader, but they gave him aid, comfort, and encouragement. We conclude that under the law these directors, if they did not have actual guilty knowledge of the fraud, yet they must stand convicted of legal fraud, for it matters not where the moral guilt lies, the fact remains that they permitted the fraud to be practiced by officers under their control.

In the case of Loan Society v. Eavenson, 248 Pa. 407, 94 A. 121, the directors were held liable to the corporation because they knowingly declared dividends which had not been earned; by want of ordinary care a loss

was incurred, through fraudulent acts which they permitted, a theft was committed by a dishonest person under their employ, and they permitted a surplus stock issuance. These directors countenanced the same acts.

In Trustees' Mutual Building Fund, etc., v. Bosseiux, supra, at page 829, the liability of directors for negligence in the administration of the corporate affairs is discussed in the following language:

"It must be borne in mind that, in respect to frauds and misapplications of money committed in consequence of the negligence of directors, and frauds and misapplications committed by directors themselves, the evil and loss are the same to the corporations whose affairs are intrusted to their management. To these corporations it matters little where the moral guilt lies. The result is the same, whether that guilt attach to the directors themselves or to the officers to whom they gave a license which was abused. And hence the Supreme Court of Appeals of Virginia very well said, in the case of Jones' Executors v. Clark, 25 Grat. 655, that there 'may be such gross negligence as may be equivalent to fraud'; a proposition which is quoted approvingly by the United States Supreme Court in Neal v. Clark, 95 U. S. 707 [24 L. Ed. 586]. And I think it is a sound proposition of law that, whenever there would be liability if the fraud had been practiced by directors themselves upon the complainant, there is like liability if there has been that gross negligence on the part of directors which has permitted the fraud to be practiced by officers under their control."

[5] Directors of a corporation are personally liable for losses resulting from any breach of duty:

"Directors who participated therein were personally liable to the corporation and its creditors, as it constituted a breach of trust. See Pardee et al. v. Harwood Electric Company, 262 Pa. 73 [105 A. 48], and authorities there cited. Such liability may be enforced against them jointly or severally. Coddington v. Canaday, 157 Ind. 243 [61 N. E. 567]; Realty Co. v. Kurtz [115 App. Div. 74] 100 N. Y. S. 723; Sigwald v. City Bank, 82 S. C. 382 [64 S. E. 398]." Fell v. Pitts, 263 Pa. 320, 106 A. 576.

[6] It is long-settled law that directors may not use the capital stock of the company for the payment of dividends, and if they do so they are personally liable to the stockholders. We cite one of many decisions:

"It may be regarded as settled law, that directors of a corporation are trustees, or quasi trustees of the capital of the company, and liable as trustees for any breach of duty with respect to the application of it. The capital of a company may not lawfully be used for the payment of dividends." Cornell v. Sleddinger, 237 Pa. 389, 85 A. 447.

[7] The special master was therefore in error when he permitted these directors, who are personally liable to the creditors of the Corporation Funding & Finance Company to participate in the distribution. They should have been excluded for the reasons herein stated, and their claims must necessarily be postponed to those of other creditors and until all other claims are paid and discharged.

[8, 9] We concur with the conclusion of the special master that interest should be allowed on the claims, under the facts in this case, only until the date of the appointment of a receiver. The receiver was appointed upon the allegation of insolvency as disclosed by the bill, and the rule is that interest should not be allowed in such case because the postponement of distribution is the fault of the machinery of the law. In such case, the debts are in statu quo, and do not bear interest after the appointment of a receiver, or an assignee in insolvency. Thomas v. Car Co., 149 U. S. 95, 13 S. Ct. 824, 37 L. Ed. 663; Solomons v. American, etc., Association (C. C.) 116 F. 676; Jamison & Co.'s Estate, 163 Pa. 143, 29 A. 1001.

In the distribution, the following preferred claims will be first paid:

| | |
|---|---|
| Costs of audit | $2,362.76 |
| Commonwealth of Pennsylvania | 1,720.50 |
| Harvey B. Lutz | 100.00 |
| Reading Life Insurance Company | 4,320.00 |
| Total | $8,503.26 |

The balance should be distributed amongst the following common creditors:

| | |
|---|---|
| Farmers' Bank of Lititz | $7,229.84 |
| Jersey Shore Trust Company | 3,227.30 |
| Blue Ball National Bank | 961.40 |
| Lancaster Trust Company | 925.00 |
| Clymer National Bank | 1,947.50 |
| Olyphant National Bank | 3,942.14 |
| Reading Life Insurance Company | 137,582.50 |
| Total | $155,815.68 |

The above-listed claims, except that of the Reading Life, are all made by persons and interests who are entire strangers to the Corporation Funding & Finance Company, having no interests as officers, directors, or stockholders, and they were in no manner responsible for or connected with the operations of this company, and should therefore not be made to suffer for the shortcomings of those who may be in any manner or degree responsible for the company's losses.

While the stockholders of the Reading Life were duped, tricked, and defrauded into making their investments, they should have probably not placed the implicit confidence in their directors and officers to the extent they did, but should have exercised some degree of vigilance in protecting their interests. We therefore direct that the following common claims be allowed in full:

| | |
|---|---|
| Farmers' Bank of Lititz | $7,229.84 |
| Jersey Shore Trust Co. | 3,227.30 |
| Blue Ball National Bank | 961.40 |
| Lancaster Trust Company | 925.00 |
| Clymer National Bank | 1,947.50 |
| Olyphant National Bank | 3,942.14 |

—and that the balance, $41,737.14, be and the same is awarded to the Reading Life Insurance Company, to be applied in liquidation, pro tanto, of its stock proceeds claim.

The special master's report is modified as herein indicated, and it is ordered and directed that distribution be made accordingly.

NOTE.—The above opinion was written by Hon. CHARLES B. WITMER not long before his death, but on account of his last illness and death he failed to sign and file it. I have heard a reargument on the questions involved, carefully examined the opinion, and have adopted and signed it as my own opinion, with some slight changes. The opinion represents much hard work, careful study, and ability. It affords me much pleasure to give all the credit to Judge WITMER for this very fine piece of work, the last opinion of his long judicial career on the bench of the United States District Court for the Middle District of Pennsylvania.